GERTRUDE BIANCHI, PLAINTIFF-APPELLANT, v. SOUTH PARK PRESBYTERIAN CHURCH, TRUSTEES OF THE SOUTH PARK PRESBYTERIAN CHURCH, A RELIGIOUS CORPORATION, AND ELLIS JENKINS, DEFENDANTS-RESPONDENTS.

Argued May 17 and 19, 1939—Decided September 22, 1939.

326

For the appellant, *Meyer M. Semel.*

For the respondents, *Reginald V. Spell* (*Wilbur A. Stevens,* of counsel).

The opinion of the court was delivered by

HEHER, J. The fundamental question at issue is whether a religious society is exempt from liability for damages to a nonmember beneficiary of its incidental philanthropy who suffers injury by reason of its negligence in the management of a house used as an appurtenance to its church.

The defendant society was organized on January 31st, 1853, under the provisions of an enactment entitled "An act to incorporate trustees of religious societies," Revision of April 17th, 1846 (*Rev. Stat.* 1846-1847, *p.* 152), applicable to "every religious society or congregation of christians, entitled to protection in the free exercise of their religion, by the constitution and laws of this state." Trustees were elected, and the name taken was "The Trustees of the South Park Presbyterian Church." Under the statute, the trustees so chosen, "and their successors in office," were "constituted a body politic and corporate in law," by the name thus assumed. They were endowed, as such corporate body, with capacity to acquire and hold lands and personalty "in trust for the use

of the said society or congregation, to an amount in value (after the manner of the English statute of mortmain) not exceeding two thousand dollars a year," and not otherwise.

The society has since maintained a church of the Presbyterian communion on lands situate on Broad Street, in the City of Newark. In 1922, it erected another building thereon, separate and apart from the church edifice, but devoted to corporate purposes. This structure housed administration offices, choir practice, reading and meeting rooms, a gymnasium and locker rooms, a kitchen and equipment, sexton's living quarters, a furnace room, and the like. The second floor consisted of a balcony overlooking the gymnasium and women's locker and retiring rooms to the rear. Access to the second floor was had by a stairway which, half way up, made a right angle turn from a landing to the second floor. The uppermost step was also at an angle.

This church house was used as a social center as well as for the administration of church affairs. Its social, recrea-tional and like uses were not confined to members of the society. A girl-scout troop of which plaintiff was a member (she was twenty-four years of age when the mishap presently to be related befell her, and her membership had then covered a period of six years) held weekly meetings there. The troop was in no sense identified with the church body. And plaintiff was not a member of the society, nor had she ever worshipped in its church. Such use of defendant's property antedated the erection of the church house. Originally, the troop gathered in the choir room of the church edifice; later on, in a larger room thereof; and, latterly, in the newly erected church house. There was no charge by the society for the privilege thus granted. The troop made a "voluntary donation" to it "at the beginning of each year." The troop captain testified thus: "We started with $5 because we felt that was all we could afford, and as we became a little larger we increased and now they are paid $25." The troop members "pay a membership fee of fifty cents when they join if they can afford it, and their dues are five cents a week, if they also can afford that." The society furnished light, heat and janitor service; and it seems to be conceded that the "donation"

so made was not sufficient to defray the outlay for light and heat, not to mention the janitor service.

On the evening of November 6th, 1936, at about nine o'clock, after adjournment of a meeting of the scout troop, plaintiff ascended the stairway to the second floor and entered the locker room, where she remained (with eight or nine fellow scouts) for approximately fifteen minutes. When she passed into the locker room, "lights were on in the lower hall and in the gymnasium." She "couldn't tell" whether the second floor lights "were on," but "it was light enough there." When she left the lighted locker room (accompanied by a fellow-member, leaving several such behind), she found the stairway in darkness. She continued: "We pushed our way along until we found the stairway. * * * We came to the stairway and tried to find the steps. We saw the first step and that was all we could see, and I fell, but I don't know how I did, it was just too dark. *Q.* You say you saw the first step? *A.* Yes, because of the white line, you could see it in the dark. *Q.* What happened after that? *A.* I missed the second one. *Q.* What happened? *A.* I just fell and let out a scream."

The contentions are made that the evidence so adduced makes out a *prima facie* case of negligence by the sexton in the extinguishment of the lower floor and stairway lights while plaintiff remained in the second floor locker room, and that such fault is imputable to his principal.

The gravamen of the complaint is negligence; and the specifications are (a) the careless extinguishment of the lights; (b) the society's "negligence" in maintaining "two or more steps at the top of the * * * staircase * * * of improper, faulty and dangerous construction, unsuited and unsafe for use as such;" and (c) the society's failure to exercise reasonable care "in the engaging, hiring and selection of a janitor," and "in keeping and retaining such incompetent employee in its service with full knowledge of his incompetency."

The learned trial judge directed a verdict for defendants on the grounds that the scout troop was a "charitable institution or, at least, a charitable foundation," and that plaintiff "was the recipient of a particular benefit offered by the

church," and the church was therefore not chargeable with the pleaded delinquency, and that there was no "allegation" in the complaint "of any act of negligence on the part" of the sexton, "individually."

There was no evidence tending to establish the allegations of negligence comprised in subdivisions (b) and (c), *supra*. But there was evidence of negligent conduct by the sexton; and thus there is presented for consideration the fundamental question of whether the defendant society is liable for negligence under the maxim *respondeat superior*.

*First:* In modern conception, such religious societies are eleemosynary corporations, and as such are exempt from liability in tort for the negligence of their servants and agents, save, perhaps, where there has been a failure of reasonable care in their selection, considered by some authorities as a breach of a nondelegable duty. The propagation of religion is now regarded as investing such societies with the attributes of a charitable institution. It is deemed so related to the general good and welfare as to command that category.

The English law of charities is derived from the civil law; and under that system of jurisprudence wills made for "good and pious uses" were considered privileged testaments, valid notwithstanding uncertainty in the objects. Such uses included bequests for "the maintenance of clergymen, the benefit of churches, hospitals, schools and colleges." Charities are not now restricted to those permitted by the law of England in the Elizabethan era. Eventually, the English Chancery came to regard as charities uses identified with public worship and the promotion of religion; and it is now the generally accepted view that a corporation devoted to the advancement of religion and education "among an indefinite number of persons" is "charitable" in character. *Trustees of Cory Universalist Society* v. *Beatty,* 28 *N. J. Eq.* 570; *affirmed, sub nom. Beatty* v. *Trustees of the Cory Universalist Church,* 31 *Id.* 796; *DeCamp* v. *Dobbins,* 29 *Id.* 36; *affirmed,* 31 *Id.* 671; *MacKenzie* v. *Trustees of Presbytery of Jersey City,* 67 *Id.* 652; *Jackson* v. *Phillips,* 14 *Allen* 539, 553, *et seq.; Fairbanks* v. *Lamson,* 99 *Mass.* 533; *Sears* v. *Attorney-General,* 193 *Id.* 551; 79 *N. E. Rep.* 772; *McNeilly* v. *First*

*Presbyterian Church,* 243 *Mass.* 331; 137 *N. E. Rep.* 691; *Glazer* v. *Congregation Kehillath Israel,* 263 *Mass.* 435; 161 *N. E. Rep.* 619.

A charity has been defined by Lord Camden as "a gift to a general public use, which extends to the poor as well as to the rich." *Jones* v. *Williams,* 2 *Ambl.* 651. Charities have their origin in the divine command to love thy neighbor as thyself. And so a "pious" gift is deemed "charitable." A gift to "a church generally creates a public charity." *Osgood* v. *Rogers,* 186 *Mass.* 238; 71 *N. E. Rep.* 306. In *Earle* v. *Wood,* 8 *Cush.* 430, 445, Chief Justice Shaw said: "All gifts and grants in trust, for the support of public worship and religious instruction, or for the advancement of piety, morality, and useful education, are valid as charitable trusts, and will be carried into effect by this court as a court of equity."

In the Dartmouth College case, Chief Justice Marshall declared that "almost all eleemosynary corporations, those which are created for the promotion of religion, of charity or of education, are of the same character. The law of this case is the law of all." *The Trustees of Dartmouth College* v. *Woodward,* 4 *Wheat.* 518, 645; 4 *L. Ed.* 629 661. And in the later case of *The Society for Propagation of the Gospel in Foreign Parts* v. *The Town of New Haven,* 8 *Wheat.* 464; 5 *L. Ed.* 662, Mr. Justice Washington classified as a "private eleemosynary corporation," created for the "administration of a public charity," the plaintiff corporation, which came into corporate being under a charter granted by King William III to a number of resident subjects of England for the purpose of making "better provision * * * for the preaching of the gospel, and the maintenance of an orthodox clergy in the colonies of Great Britain." It was pointed out that "the endowment of the corporation was to be derived solely from the benefactions of those who might think proper to bestow them, and to this end the society was made capable to purchase and receive real estates, in fee, to a certain annual value (as was the case with the cited New Jersey statute of 1846, although the limitation did not apply to real estate alone), and also estates for life, and for years, and all manner of goods and chattels to any amount."

Thus it is that the test of a charity in the legal sense is whether its beneficence falls upon a class sufficiently large and indefinite as to be fairly termed of common and public incidence; and the defendant corporation answers that description.

*Second:* It is embedded in our jurisprudence that a charitable corporation is not liable to a recipient of its benefactions for the mere negligence of its servants in the management of the trust property. This doctrine is grounded in what has been deemed sound public policy. *D'Amato* v. *Orange Memorial Hospital,* 101 *N. J. L.* 61; *Boeckel* v. *Orange Memorial Hospital,* 108 *Id.* 453; *affirmed,* 110 *Id.* 509; *Simmons* v. *Wiley M. E. Church,* 112 *Id.* 129; *Kolb* v. *Monmouth Memorial Hospital,* 116 *Id.* 118. As pointed out *supra,* the instant case does not raise the question of the liability of such a charity to one of its beneficiaries for failure to exercise reasonable care in the selection of its negligent servant, and there is therefore no occasion to consider that point. For the conflicting views on this question, see *Bodenheimer* v. *Confederate Memorial Asso.,* 68 *Fed. Rep.* (2d) 507; *certiorari* denied, 292 *U. S.* 629; 54 *S. Ct.* 643; 78 *L. Ed.* 1483; *Schumacker* v. *Evangelical Deaconess Society,* 218 *Wisc.* 169; 260 *N. W. Rep.* 476; *Southern Methodist Hospital and Sanitorium* v. *Wilson,* 45 *Ariz.* 507; 46 *Pac. Rep.* (2d) 118; *Shane* v. *Hospital of Good Samaritan,* 2 *Cal. App.* (2d) 334; 37 *Pac. Rep.* (2d) 1066.

*Third:* It remains to consider whether or no plaintiff was in the legal sense a beneficiary of the charity. It is argued that the charity's trustees "maintained and controlled" the particular church house "for purposes unassociated with its religious function," and the plaintiff was therefore a stranger to its benevolence.

This is an illusory distinction. The church function is not so narrowly confined. It is not limited to sectarian teaching and worship. In modern view, exercises designed to aid in the advancement of the spiritual, moral, ethical and cultural life of the community in general are deemed within the purview of the religious society. A social center is now commonly regarded as a proper adjunct of the local church—con-

ducive to the public good as well as advantageous to the congregation. For example: The scout movement has its genesis in the associations fostered by churches and community groups in the early part of the twentieth century whose objective was the training of the youth in right living and exemplary citizenship, and thus to develop and ennoble character to the enrichment of society as well as the good of the individual. The immediate aim was the elimination of the temptations of leisure through useful pursuits.

Such activities are plainly classable as a secondary church function in aid of its primary purpose. They serve as well to exemplify religious doctrine. And, wholly apart from their religious significance, they are essentially charitable in nature as designed to advance the common interest in basal particulars. The vitalization of the spiritual concept of the brotherhood of man—the bond that "makes all men one"— fundamental in the social compact as expressed in our American democracy, is of paramount public concern. As stated, such is the source of the charitable use. Social education and action are not alien to the fundamental purposes of a religious society; quite the contrary. The social regeneration of mankind, closely akin as it is to moral uplift, indubitably lies within the domain of the church. In addressing itself to moral, social and economic evils and problems, the church serves the highest interests of society.

And so the provision of quarters for this particular use did not constitute a deviation from the society's essential purpose so as to strip it *pro hoc vice* of the habiliments of a religious charity. Rather, such endeavors, having in view the public interest, serve the more to give the body the character of a charitable institution. The "beneficiaries" in the legal view are not limited to members of the congregation, or to those who, believing in the discipline and doctrine of Presbyterianism, are in attendance for public worship.

And, in the circumstances, it is of no consequence that the scout members paid dues and the troop itself made a "donation" to the defendant society for the service thus accorded. Compare *D'Amato* v. *Orange Memorial Hospital, supra.*

*Fourth:* While these considerations do not lead to exculpa-

tion of the sexton, yet for another reason, common to both defendants, the judgment must be affirmed *in toto*.

Reason and justice dictate that one cannot deliberately incur an obvious risk, especially where preventive means are at hand, and then hold the author of the danger for the ensuing damage. Whether such conduct be classed as an assumption of risk or contributory negligence, it precludes recovery. There was no controversy here as to what plaintiff did or failed to do; and the evidence was not fairly susceptible of divergent inferences on the question of whether her conduct met the requirements of due care. It did not reasonably admit of an affirmative answer to that inquiry. Plaintiff was *sui juris*. She indisputably knew and appreciated the hazard of injury arising from the special circumstances. The danger was obvious to one reasonably regardful for his own security. And there was no element of compulsion in what plaintiff did. The course taken was wholly voluntary; it was in no sense one of necessity or reasonably to be considered as such by the actor. She did not take advantage of known available means to insure her safety. She made no effort to apprize the sexton of her plight, either directly or through others in the building, nor did she secure the aid of the light in the locker room which the opening of the door would have provided. Thus, it conclusively appears that, fully comprehending the risk, plaintiff chose to rely upon her ability to descend the stairs without mishap; and in such circumstances she cannot visit upon the sexton the consequences of her fall. Compare *Gleason* v. *Boehn,* 58 *N. J. L.* 475; *Saunders* v. *Smith Realty Co.,* 84 *Id.* 276; *Rooney* v. *Siletti,* 96 *Id.* 312; *Solomon* v. *Finer,* 115 *Id.* 404. The cases of *Andre* v. *Mertens,* 88 *Id.* 626, and *Roth* v. *Protos,* 120 *Id.* 502, are factually distinguishable.

Judgment affirmed.

*For affirmance*—The CHANCELLOR, CHIEF JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PORTER, HETFIELD, DEAR, WELLS, WOLFSKEIL, RAFFERTY, HAGUE, JJ. 14.

*For reversal*—PERSKIE, J. 1.