815 A.2d 419

JAMIE C. RYAN AND ROBERT J. RYAN, HER HUSBAND, PLAINTIFFS–RESPONDENTS AND CROSS–APPELLANTS, v. HOLY TRINITY EVANGELICAL LUTHERAN CHURCH, DEFENDANT AND CROSS–RESPONDENT, AND MOTHERS' CENTER OF MONMOUTH COUNTY, DEFENDANT–APPELLANT, AND LAURA FADEM, JOHN DOE (1–5), A FICTITIOUS NAME, PARTY INTENDED BEING UNKNOWN AND ABC CORPORATION (1–5), A FICTITIOUS NAME, PARTY INTENDED BEING UNKNOWN, DEFENDANTS.

Argued December 3, 2002—Decided February 11, 2003.

334

*Mauro C. Casci,* (*Mr. Casci,* attorney; *Adam E. Levy,* on the brief), argued the cause for appellant.

*Harry V. Osborne, II,* argued the cause for respondents and cross-appellants (*Evans, Osborne* and *Kreizman,* attorneys).

*David M. Molnar,* argued the cause for cross-respondent (*Anthony W. Guidice,* attorney).

The opinion of the Court was delivered by

LONG, J.

Once again we consider the Charitable Immunity Act, *N.J.S.A.* 2A:53A –7 to –11 (the Act). More particularly, we are called on to determine whether an association organized exclusively for educational purposes is nevertheless required to demonstrate some level of income from charitable donations to qualify for immunity. We have concluded that it need not. We also have determined that a church can be engaged in its "good works" when it opens its premises to a nonprofit community organization for a nominal fee, and that partakers of the works of the community organization can thus qualify as beneficiaries of the works of the church.

I

In 1997, plaintiffs Jaime C. Ryan and Robert J. Ryan, husband and wife, filed a complaint in the Superior Court, Law Division, Monmouth County against defendants Holy Trinity Evangelical Lutheran Church, the Mothers' Center of Monmouth County, Laura Fadem, and a series of John Doe defendants. The complaint alleged that due to defendants' tortious conduct, Mrs. Ryan suffered injuries while attending a meeting of the Mothers' Center that was held in Holy Trinity.

All defendants answered, denying the allegations of the complaint and cross claiming against each other for contribution and indemnification. Eventually defendants moved for summary judgment. Charitable immunity was the pivotal issue.

The facts established by the pleadings, discovery, and other documents on file basically are uncontroverted. Mrs. Ryan was injured on the morning of November 17, 1995, while attending a meeting of the Mothers' Center, held in Holy Trinity's parish house. At the time, she was seven months pregnant.

The Mothers' Center, formed in 1987, is a nonprofit[1] group of parents and expectant mothers organized to exchange experiences

---

[1] On October 14, 1988 the Internal Revenue Service determined that the Mothers' Center was organized exclusively for educational purposes and that no

and receive information regarding childbirth, child rearing, mothering, and family relationships. A council of volunteers runs the Center. The organization is non-hierarchical, and decision-making is by consensus. In 1995, there were approximately 80 to 100 members. According to the bylaws of the Mothers' Center, its purpose is

> to promote the welfare and meet the needs of mothers; to help mothers to maintain and improve their self-esteem in their roles as mothers; to facilitate the free and confidential exchange of ideas and current information on birthing, childrearing and maintaining a family; to offer a non-judgmental forum for the discussion of the challenges and crises of motherhood; and to provide child care programs that enable mothers to separate from their children if they so choose, and allow mothers relaxed time to participate in Center activities.

The promotion of those purposes, according to the bylaws of the Center, is to be effectuated through "an education program directed toward parents...." The Mothers' Center runs a number of programs, including a post-partum project, along with discussions and informational groups on parenting techniques and discipline. At general membership meetings, speakers are often scheduled to talk on topics relating to parenting and motherhood, including medical issues.

The Mothers' Center also provides childcare during meetings, which enables its members to participate in group discussions and other activities. Childcare services are provided, along with playgroups for children and activities for mothers and children together.

The Mothers' Center is open to non-members. Anyone who subscribes to its basic policies and purposes and wishes to take advantage of its programs is welcome. Members pay annual dues as well as fees to participate in the organization's activities. The dues in 1995 were $25 for the year. Membership is not required for programs but is necessary for participation in the governance of the participants.

---

part of any earnings would inure to the benefit of any private shareholder or individual, thus warranting nonprofit status.

Generally, the discussion groups meet weekly. Each subject is covered in depth over approximately an eight-week period. Trained facilitators focus the discussions, present topics, and resolve any disagreements between participants.

Mrs. Ryan was a member of the Mothers' Center and had been attending a group that focused on early childhood development. Ten to twelve mothers typically participated in that group. Although the meetings for some discussion groups were held in members' homes, the group Mrs. Ryan was attending held its weekly meetings at the parish house of Holy Trinity. At the November 17, 1995, meeting, the participants sat in a circle around the room on folding chairs. Mrs. Ryan was seated near a supply closet.

One of the two group facilitators for that meeting was defendant Laura Fadem.[2] On November 17, 1995, Fadem brought her children with her to Holy Trinity. She sent her daughter to the childcare room on the second floor, and took her son with her to the meeting. Forty-five minutes into the meeting, the boy wandered over to a supply closet door and apparently tried to open it. The door appears not to have been properly hinged, and when it was pulled, it detached and struck Mrs. Ryan on the back of her head, causing her to fall to the floor. She alleges that, as a result, she suffered significant injuries and required long-term treatment, including surgery.

At the time of the accident, Holy Trinity had a policy of opening its doors to social outreach projects with community purposes and allowing them to use its facilities to conduct meetings. Those groups included the Boy Scouts, Alcoholics Anonymous, Al–Anon, the Children's Psychiatric Center, and a Monday night social club for mentally challenged people. Holy Trinity included notices of meetings in the church bulletin.

---

[2] The other facilitator is not a party to the litigation.

Permission to use a room could be obtained from the church council for a fee of $15. Although not entirely clear, that fee appears to have been based on the church's estimation of how much was needed to cover the costs of electricity, heat, and air conditioning, in other words, the cost of keeping the building open. Each group that used the church's facilities paid the same fee. Holy Trinity asserted in discovery that no group was refused permission to use the church facilities if it could not afford the fee. The Mothers' Center used the church facilities for many different meetings. Payments were made by check from the Mothers' Center to Holy Trinity. During the period July through December 1995, the Mothers' Center used the church facilities a total of 31 times. At $15 per use, the Mothers' Center paid Holy Trinity a total of $465 for that period.

On those facts, the trial court granted summary judgment to all defendants based on charitable immunity. The Ryans appealed. The Appellate Division affirmed the dismissal of the Ryans' complaint against Holy Trinity and Laura Fadem, individually, and reversed the dismissal against the Mothers' Center and Laura Fadem as its agent. Because the evidential record is silent regarding the Mothers' Center's income (other than dues and fees) the Appellate Division, citing *Bieker v. Community House of Moorestown*, 169 *N.J.* 167, 178, 777 *A.*2d 37 (2001), and *Parker v. St. Stephen's Urban Dev. Corp., Inc.*, 243 *N.J.Super.* 317, 326, 579 *A.*2d 360 (App.Div.1990), remanded the case for a determination of whether the Mothers' Center received any part of its operating income from charitable contributions.

The Mothers' Center petitioned for certification and the Ryans filed a Cross-Petition. On May 13, 2002, we granted both petitions. 172 *N.J.* 355, 798 *A.*2d 1269 (2002). We now affirm in part and reverse in part.

## II

The heart of the Mothers' Center's argument is that under this Court's recent decision in *O'Connell v. State*, 171 *N.J.* 484, 491,

795 *A.*2d 857 (2002), the finding that it was organized exclusively for educational purposes obviated any further inquiry regarding its finances. The Ryans counter that under *Bieker, supra,* 169 *N.J.* at 178, 777 *A.*2d 37, and *Parker, supra,* 243 *N.J.Super.* at 326, 579 *A.*2d 360, a further financial inquiry is compelled.

The Ryans' cross-petition is focused on Holy Trinity. Although they acknowledge that Holy Trinity is organized exclusively for religious purposes, they maintain that the Mothers' Center was a purely secular operation that had no connection to the religious works of Holy Trinity and was solely a tenant of the church. As such, although Mrs. Ryan was a beneficiary of the works of the Mothers' Center, she was not so positioned relative to Holy Trinity.

Holy Trinity argues that the Ryans' vision of its mission is too narrow and that it is entitled to immunity because its provision of a forum for the Mothers' Center to hold its meetings was "in furtherance of the tenets and principles of the Lutheran faith to enhance, enrich and promote the cultural, moral, ethical and spiritual life of the community at large." As such, Holy Trinity urges that in accordance with its religious principles, it made available its facilities to nonprofit organizations engaged in "social outreach type endeavors," that the Mothers' Center was one of those organizations, and that Mrs. Ryan was therefore a beneficiary of Holy Trinity's works.

### III

The Charitable Immunity Act provides:

No nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes or its trustees, directors, officers, employees, agents, servants or volunteers shall, except as hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society or association or of its agents or servants where such person is

one unconcerned in and unrelated to and outside the benefactions of such corporation, society or association.

[*N.J.S.A.* 2A:53A–7.]

The history of the Act has been recounted repeatedly, *Bieker, supra,* 169 *N.J.* at 174–75, 777 *A.*2d 37; *Schultz v. Roman Catholic Archdiocese of Newark,* 95 *N.J.* 530, 537, 472 *A.*2d 531 (1984); *Hamel v. State,* 321 *N.J.Super.* 67, 73–74, 728 *A.*2d 264 (App.Div.1999), and need not be repeated here, except to note that its original purpose was to avoid the diversion of charitable trust funds "to non-charitable purposes in order to live up to the reasonable expectations of the benefactors." *Parker, supra,* 243 *N.J.Super.* at 321, 579 *A.*2d 360.

Over time, however, our case law has recognized that the purposes underlying charitable immunity are broader than simply preserving charitable trust funds and include the encouragement of altruistic activity. *See O'Connell, supra,* 171 *N.J.* at 496, 795 *A.*2d 857 ("[T]he statute's legislative history suggests that preservation of a charity's assets was only one of a number of purposes propelling the [Act's] enactment."); *Schultz, supra,* 95 *N.J.* at 537, 472 *A.*2d 531 ("The focus of the legislative process was not on the question of what exceptions were consistent with the historical development of the doctrine of common law charitable immunity. The focus was on the economic effect of abolition of the doctrine upon the charities.") (citing *Hearings on S. 204 re Exemption of Religious, Charitable and Hospital Organizations from Negligence Liability, Before the Assembly Judiciary Committee* (July 17, 1958)); *Abdallah v. Occupational Ctr. of Hudson County,* 351 *N.J.Super.* 280, 284, 798 *A.*2d 131 (App.Div.2002) ("[T]here is agreement that [the Act's] underlying purpose and rationale have always been the protection and encouragement of private philanthropy both to assure the continued provision of beneficent services and to relieve government of the burden of providing them.") (citing *Restatement (Second) of Torts* § 895E cmt. c (1979); 2 *Harper & James on Torts,* § 29.16 (1956)); *see also* Note, The Quality of Mercy: "Charitable Torts" and Their Continuing Immunity, 100 *Harv. L.Rev.* 1382, 1384 (1987) ("[S]ome courts,

pointing to public policy considerations in favor of charitable good works, feared that damage awards might drive charities to bankruptcy or cost them prospective donors.") (citing *Vermillion v. Woman's College of Due West*, 104 *S.C.* 197, 88 *S.E.* 649 (1916)).

Distilling the statutory language to its essence, this Court has held that "an entity qualifies for charitable immunity when it '(1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then. a beneficiary of the charitable works.' " *O'Connell, supra,* 171 *N.J.* at 489, 795 *A.*2d 857 (quoting *Hamel v. State,* 321 *N.J.Super.* 67, 72, 728 *A.*2d 264 (App.Div.1999)).

As an interpretive rationale, *N.J.S.A.* 2A:53A–10 instructs that the Act

shall be deemed to be remedial and shall be liberally construed so as to afford immunity to the said corporations, societies and associations from liability as provided herein in furtherance of the public policy for the protection of nonprofit corporations, societies and associations organized for religious, charitable, educational or hospital purposes.

[*Ibid.*]

That is the backdrop for our inquiry.

## IV

We turn initially to the petition of the Mothers' Center. The Ryans have conceded the nonprofit status of the Mothers' Center and that, at the time of the accident, Mrs. Ryan was a beneficiary of its works. Several matters remain to be resolved.

## A.

The first issue is the propriety of the Appellate Division's conclusion that, although the Mothers' Center was organized exclusively for educational purposes, it was nevertheless required to make a showing that its operating capital was derived from charitable contributions or trust fund income to satisfy the second prong of the charitable immunity standard. Quoting *Parker, supra,* 243 *N.J.Super.* at 326, 579 *A.*2d 360, the court held that

such a showing is necessary because the public policy foundation for the Act is "the preservation of private charitable contributions for their designated purposes."

We turn again to the Act, which provides in relevant part that an entity seeking charitable status must be "organized exclusively for religious, charitable or educational purposes." *N.J.S.A.* 2A:53A-7. Although the overarching character of all three categories is eleemosynary, they are actually quite distinct. Two are specific as to subject matter (educational and religious), and one is a generic catchall term (charitable). Both "educational" and "religious" have a limited and commonly understood meaning. On the contrary, "charitable" is a more complex notion that defies precise definition. *See Presbyterian Homes v. Division of Tax Appeals*, 55 *N.J.* 275, 285, 261 *A.*2d 143 (1970) ("It is evident . . . that the term 'charity' in a legal sense is a matter of description rather than a precise definition.").

The cornerstone of our analysis is *O'Connell, supra*, 171 *N.J.* at 484, 795 *A.*2d 857. There, the issue was whether Montclair State University was entitled to charitable immunity in connection with a student's injury on its premises. The Appellate Division reversed the trial court's grant of summary judgment in favor of Montclair on the ground that a public entity is not entitled to assert the defense of charitable immunity. *Id.* at 487, 795 *A.*2d 857. We granted certification. Obviously the public entity aspect of that case was unique. However, in ruling, we had occasion to address generally the language of the charitable immunity statute. In so doing, we clarified that an entity satisfying the elements plainly set forth in the Act would be entitled, without further analysis, to immunity. *Id.* at 491, 795 *A.*2d 857. More particularly, we held that an entity organized exclusively for educational purposes automatically meets the second prong of the charitable immunity standard. Because Montclair was a nonprofit entity, organized exclusively for educational purposes, and because O'Connell, as a student, was plainly a beneficiary of its works, our

ultimate conclusion was that nothing more had to be proved to justify the application of charitable immunity. *Ibid.*

The Ryans maintain that there is a disconnection between *O'Connell,* on the one hand, and *Bieker* and *Parker,* on the other. In *Parker,* the Appellate Division considered whether a nonprofit community development corporation that sponsored low- and moderate-income housing and funneled federal money into the projects could qualify for charitable immunity. *Parker, supra,* 243 *N.J.Super.* at 321–22, 324, 579 *A.*2d 360. Recognizing the fact-sensitive nature of such an inquiry, the court in *Parker* properly concluded that nonprofit status alone meets only the first prong of the Act and that performance of a useful service does not *per se* compel the corollary that an organization is engaged in charitable activity. *Id.* at 324–25, 579 *A.*2d 360. In other words, *Parker* requires courts to look beyond the nonprofit status of an entity and even beyond its benevolent acts to determine whether it is organized exclusively for "charitable" purposes:

> What is required is an examination of the entity seeking to clothe itself in the veil of charitable immunity to discover its aims, its origins, and its method of operation in order to determine whether its dominant motive is charity or some other form of enterprise.
>
> [*Id.* at 325, 579 *A.*2d 360.]

Applying those principles, the court in *Parker* ruled that the community housing corporation before it was not entitled to immunity because it did not seek to provide housing through its own efforts, either by the dedication of church funds or through a program of charitable solicitation; because its board members were unpaid, not because of any benevolent instinct, but as a *quid pro quo* for federal funding; and because it was created, not to lessen the burden on government, but to obtain as much money from the government as possible, and to run its program with that money. The court concluded that, as a conduit for federal money, the housing corporation was not an entity organized exclusively for charitable purposes but was the "quasi-public sponsor of a federally funded housing project." *Id.* at 327, 579 *A.*2d 360.

That fact-sensitive approach is in line with our prior treatment of the notion of "charitable purposes." Such a determination "depends on the facts or circumstances of each case." *Presbyterian Homes, supra,* 55 *N.J.* at 285, 261 *A.*2d 143. In *Presbyterian Homes,* a nonprofit organization that provided housing for the aged sought a property tax exemption because its property was being operated for a "charitable purpose." Although we recognized care of the elderly as laudable and the aim of the sponsor as altruistic, we held that the question of whether it was charitable depended on the manner in which the property was used to achieve that end. *Id.* at 288, 261 *A.*2d 143. We found that manner wanting. The by-laws of Presbyterian Homes did not obligate it to continue providing a home to seniors who were not financially equipped to pay its fees or who became ill. Seniors who had expended all of their assets could be turned out and potentially could become public charges. Moreover, although rental fees in themselves would not necessarily eliminate charitable status, there was a direct relationship between the size of the rental payment and the desirability of the unit. *Id.* at 286–87, 261 *A.*2d 143. In rejecting the charitable characterization, we invoked the reasoning of the Illinois Supreme Court in *Methodist Old Peoples Home v. Korzen,* 39 *Ill.*2d 149, 158, 233 *N.E.*2d 537 (1968), concluding that such circumstances lack "the warmth and spontaneity indicative of charitable impulse." *Presbyterian Homes, supra,* 55 *N.J.* at 287, 261 *A.*2d 143.

We recently cited *Presbyterian Homes* and *Parker* approvingly in *Bieker, supra,* 169 *N.J.* at 178–79, 777 *A.*2d 37. There, the Moorestown Community House, a nonprofit corporation that operated and rented meeting rooms and athletic facilities both to charitable and for-profit entities contended that it was organized exclusively for "charitable" purposes. *Id.* at 172–73, 777 *A.*2d 37. We held that a determination was needed regarding whether the dominant motive of the Community House was, in fact, charitable or some other form of enterprise. Although recognizing that receiving income from some limited non-charitable activity would not prevent an otherwise eligible entity from obtaining immunity,

we held that the question of how much of the rental operation was devoted to for-profit entities had to be resolved in order to determine whether the entity was exclusively charitable. *Id.* at 178–79, 777 *A.*2d 37.

*O'Connell* did not distinguish *Parker* or *Bieker* because they were not relevant to its analysis. *O'Connell* was concerned only with an entity "organized exclusively for educational purposes." *O'Connell, supra,* 171 *N.J.* at 491, 795 *A.*2d 857. In that case, we interpreted the Charitable Immunity Act literally and held that the second prong of the Act was satisfied based solely on the fact that education was Montclair's exclusive purpose. *Ibid.* The same analysis would apply to an entity "organized solely for religious purposes." The reason is that "the terms 'educational' and 'religious' have plain meanings that are subject to literal reading." *Abdallah, supra,* 351 *N.J.Super.* at 284, 798 *A.*2d 131. In contrast, as the court in *Abdallah* observed in assessing the "charitable" characterization in connection with an entity that served as a combination employment agency and shelter workshop:

> [W]here a non-profit, non-religious, non-educational organization relies on the immunity based on its asserted charitable status, a traditional analysis as exemplified by *Parker,* which looks beyond the organization's non-profit structure and social service activities, continues to be mandated. And, we are convinced, that traditional analysis must take into account the organization's source of funds as a critical element of charitable status.
>
> [*Id.* at 284, 798 *A.*2d 131.]

We fully subscribe to that view. Entities that can prove they are organized exclusively for educational or religious purposes automatically satisfy the second prong of the charitable immunity standard. Entities seeking the shelter of the Act by proving that they are "organized exclusively for charitable purposes" must engage in the traditional factual analysis of *Parker,* including a source of funds assessment.

In the present case, the Mothers' Center's claim of entitlement to charitable immunity is grounded in the assertion that it is organized exclusively for educational purposes. If that is correct, *O'Connell* governs and no further financial analysis is required to satisfy the second prong of the Act.

### B.

Although few cases have addressed the phrase "organized exclusively for educational purposes," those that have had occasion to do so have interpreted it broadly. In *Pomeroy v. Little League Baseball of Collingswood*, 142 *N.J.Super.* 471, 473, 362 *A*.2d 39 (App.Div.1976), the court was required to determine whether the defendant, Little. League Baseball of Collingswood, was organized exclusively for educational purposes. In attempting to define "educational purposes," *Pomeroy* quoted from earlier case law: "Education is defined as 'discipline of mind or character through study or instruction.'" *Id.* at 474, 362 *A*.2d 39 (quoting *Stoolman v. Camden County Council Boy Scouts*, 77 *N.J.Super.* 129, 135, 185 *A*.2d 436 (Law Div.1962) (quoting Webster's New Collegiate Dictionary)).

The proof presented in *Pomeroy* was that the defendant's exclusive purpose was "the education of young people in the ideals of good sportsmanship, honesty, loyalty, courage and reverence" so that they would become happy and productive citizens. *Pomeroy, supra*, 142 *N.J.Super.* at 474, 362 *A*.2d 39. That the objective was accomplished through the teaching and supervision of athletic skills did not vitiate ·the exclusively educational nature of that purpose. *Ibid.* The same result was reached in *Stoolman, supra*, 77 *N.J.Super.* at 135, 185 *A*.2d 436, concerning the Boy Scouts. *Pomeroy's* broad interpretation of the education clause has been cited with approval by the Appellate Division in *Morales v. New Jersey Academy of Aquatic Sc.*, 302 *N.J.Super.* 50, 54, 694 *A*.2d 600 (App.Div.1997) (citing *Pomeroy* for broad definition of educational purpose under Act), and most recently by us in *Bieker, supra*, 169 *N.J.* at 177, 777 *A*.2d 37.

We think the Mothers' Center fits the profile of an entity organized exclusively to provide educational opportunities. That purpose was declared in its bylaws and is revealed in its operation, which includes lectures, discussions, and the general exchange of information. Indeed, on a continuum, the Mothers' Center is more like a traditional education program than the Little League

or the Boy Scouts, organizations that were previously acknowledged as within the "organized exclusively for educational purposes" clause. *Pomeroy, supra,* 142 *N.J.Super.* at 474, 362 *A.*2d 39; *Stoolman, supra,* 77 *N.J.Super.* at 135, 185 *A.*2d 436.

The Ryans argue that Mrs. Ryan's participation in a "discussion" does not qualify as "educational." Obviously, the Socratic method belies that statement. Moreover, our case law indicates that the form that the education takes is not a touchstone for qualifying for immunity. In any event, the discussions fostered by the Mothers' Center are not random conversations but are focused and directed by facilitators who are trained to oversee the process. Through the discussion methodology, new and inexperienced parents learn from those who have been through the same experience, as well as from their peers who are also learning by doing. Although the subject may not be academic, it is serious and important. Further, it is clear that the discussion format is only one of the educational methodologies of the Mothers' Center. Lecturers also are provided at many meetings.

To avoid the conclusion that the Mothers' Center is organized exclusively for educational purposes, the Ryans characterize it as a fraternal organization. *Kirby v. Columbian Institute,* 101 *N.J.Super.* 205, 209, 243 *A.*2d 853 (Cty.Law Div.1968), set out a bright-line rule that fraternal organizations are barred from charitable immunity because charitable immunity requires that an entity be organized *solely* for charitable, religious, or educational purposes. As *Kirby* suggests, a fraternal organization is organized, at least partially, to benefit its own members and thus cannot be exclusively charitable. *Ibid.; see also Beicht v. American Polish Veterans, Inc.,* 259 *N.J.Super.* 79, 81, 611 *A.*2d 168 (Law Div.1992) (refusing to apply charitable immunity to fraternal veterans' association partly because status as fraternal organization precluded finding that it was organized "exclusively" for charitable, religious, or educational purposes); 15 *Am.Jur.* 2d Charities § 203 (2002) (stating fraternal organizations are generally precluded from claiming charitable immunity); 1A *Fletcher Cyclopedia of Private*

*Corp.* § 77 (2002) (same). *Cf. Alpha Rho Alumni Ass'n v. City of New Brunswick,* 126 *N.J.L.* 233, 235, 18 *A.*2d 68 (1941) (defining "fraternal organization" for tax purposes to be group "*organized to assist its members* and to promote moral, intellectual and social benefits," in case involving sorority alumnae group) (emphasis added); *see also Conrad v. Maricopa County,* 40 *Ariz.* 390, 12 *P.2d* 613, 615 (1932) (surveying states and finding bulk of authority to be in favor of rule that fraternal organizations may not be considered "charitable" for tax exemption purposes where state statute or constitution required that they be "strictly" or "exclusively" charitable).

The Mothers' Center does not fit *Kirby's* definition of a fraternal organization. Unlike the sorority in *Alpha Rho,* or the recreation center in *Kirby,* the Mothers' Center is organized exclusively to educate all interested parents and does not focus its educational activities on advancing the interests of its members. Although it is true that the Mothers' Center maintains a membership roster, the only benefit it affords members is participation in the Center's management. Membership in no way determines access to the lectures, discussions, and educational programs hosted by the Center.

■ In sum, the Mothers' Center passes muster as an entity "organized exclusively for educational purposes." Its aim is the conveyance of information to all interested parents and prospective parents about birth and childrearing. The discussion format, like the lecture format, is a valid method of pedagogy. Ancillary services that are provided advance the educational mission of the Center. Thus, no further inquiry is required concerning the second prong of the Act.

■ That said, and the Ryans having conceded the Mothers' Center's nonprofit status and that Mrs. Ryan was a beneficiary of its works, the Mothers' Center and Laura Fadem, as its agent, are entitled to summary judgment based on charitable immunity.

## V

Next, we turn to the Ryans' cross-petition relative to Holy Trinity. No issue regarding the nonprofit status of Holy Trinity has been advanced by the Ryans. Indeed, the first prong of the charitable immunity test is conceded. The Ryans also concede that Holy Trinity is organized exclusively for religious purposes. What is at issue is whether Holy Trinity satisfies the third prong of the test: at the time of the accident, was it engaged in its charitable works, and was Mrs. Ryan a beneficiary of those works?

The established test for determining whether a party is a beneficiary of the works of a charity has two prongs. The first is that the institution pleading the immunity, at the time in question, "was engaged in the performance of the charitable objectives it was organized to advance." *Anasiewicz v. Sacred Heart Church*, 74 *N.J.Super.* 532, 536, 181 *A.*2d 787 (App.Div.), *certif. denied*, 38 *N.J.* 305, 184 *A.*2d 419 (1962). The second is that the injured party must have been a direct recipient of those good works. *DeVries v. Habitat for Humanity*, 290 *N.J.Super.* 479, 487–88, 676 *A.*2d 152 (App.Div.1996), *aff'd o.b.*, 147 *N.J.* 619, 689 *A.*2d 142 (1997).

In assessing whether a claimant is a beneficiary of the works of a religious institution, our courts have defined liberally the term "works":

> The church function is not ... narrowly confined. It is not limited to sectarian teaching and worship. In [the] modern view, exercises designed to aid in the advancement of the spiritual, moral, ethical and cultural life of the community in general are deemed within the purview of the religious society. A social center is now commonly regarded as a proper adjunct of the local church—conducive to the public good as well as advantageous to the congregation.
>
> [*Bianchi v. South Park Presbyterian Church*, 123 *N.J.L.* 325, 332–33, 8 *A.*2d 567 (E. & A.1939).]

That principle was cited recently with approval by this Court in *Bieker, supra*, 169 *N.J.* at 176, 777 *A.*2d 37 (quoting *Loder v. Saint Thomas Greek Church*, 295 *N.J.Super.* 297, 302, 685 *A.*2d 20 (App.Div.1996) (quoting *Bianchi, supra*, 123 *N.J.L.* at 332–33, 8 *A.*2d 567)).

*Bianchi* is on all fours with this case. There, the defendant religious society operated a building next to its church that housed, among other things, the administration offices, choir practice, a gymnasium and meeting rooms. The church house, as it was called, was used as a social center as well as for administration of church affairs. Its social and recreational uses were not confined to the members of the religious society. *Id.* at 328, 8 *A.*2d 567. A Girl Scout troop, of which the plaintiff was a member, held weekly meetings at the church house. The troop made a voluntary donation to the church at the beginning of each year that was not sufficient to defray the costs of keeping the building open for its meetings. Other than to use the church house and to make the annual donation, the troop was not affiliated with the church body. *Ibid.*

The plaintiff, who suffered injury when she fell down an unlit staircase in the church house, filed suit against the church. The trial court directed a verdict for the church, in part, on the ground that the plaintiff was a beneficiary of its good works. *Id.* at 329–30, 8 *A.*2d 567. In affirming, the Court of Errors and Appeals concluded that permitting the troop to use the church house for its meetings was "plainly classifiable as a secondary church function in aid of its primary purpose," which served to exemplify the religious doctrine. *Id.* at 333, 8 *A.*2d 567.

Our cases have followed that expansive view. For example, in *Anasiewicz,* the plaintiffs attended a wedding ceremony as invited guests at the defendant Sacred Heart Church where Mrs. Anasiewicz fell and suffered injuries. *Anasiewicz, supra,* 74 *N.J.Super.* at 533–34, 181 *A.*2d 787. She brought suit against Sacred Heart. *Ibid.* In determining whether Mrs. Anasiewicz was a beneficiary of the works of the church, the Appellate Division found that, although not members of Sacred Heart, the plaintiffs were within the benefactions of the church. "Whether they actually benefited spiritually by their attendance [was] of no moment." *Id.* at 537–38, 181 *A.*2d 787. The court went on to identify as the work of the church "the preservation of moral or

sociological concepts held by the community generally." *Id.* at 538, 181 *A.*2d 787.

Even when a religious organization is not advancing its own religious tenets, or promoting religion at all, it can still be engaged in its "works." In *Bixenman v. Christ Episcopal Church Parish House,* 166 *N.J.Super.* 148, 150, 399 *A.*2d 312 (App.Div.1979), the defendant Christ Episcopal Church loaned its premises to a Greek Orthodox church for a nominal fee until such time as the Greek Orthodox church could move into its own facilities. The plaintiff, a member of the Greek Orthodox church, was injured while leaving the parish house of Christ Episcopal after having attended services of the Greek Orthodox church held on the premises. *Id.* at 150–51, 399 *A.*2d 312. Applying the rule of *Bianchi,* the Appellate Division concluded that the defendant was engaging in its "works" when it loaned its facilities to the Greek Orthodox church. Facilitating worship, whether by its own parishioners, or those of a different faith, is one of the foremost reasons for which churches exist. *Id.* at 151, 399 *A.*2d 312.

Recently, the court in *Loder,* continued the broad definition of "works" that had been set forth in our case law. *Loder, supra,* 295 *N.J.Super.* at 297, 685 *A.*2d 20. There, a patron at a church-sponsored cultural festival was injured on church property. The festival apparently included service of food as well as demonstrations of dancing. The patron, Loder, was not a member of the church and had gone to the festival to enjoy the food. *Id.* at 299–300, 685 *A.*2d 20. The Appellate Division found that there was no doubt that St. Thomas was engaged in the performance of its objectives. Through the festival, it was attempting to demonstrate to the community the rich traditions of the Greek Orthodox Church and the importance of the Hellenic culture in the Orthodox religion, as expressed through food and dance. *Id.* at 302, 685 *A.*2d 20. According to the court, those activities bore a direct and substantial relationship to the church's function. *Id.* at 303, 685 *A.*2d 20. We cited *Loder* with approval in *Bieker, supra,* 169 *N.J.* at 176, 777 *A.*2d 37.

■ In this case, in furtherance of the tenets and principles of the Lutheran Church, Holy Trinity provided space for community organizations to conduct meetings. By supporting social outreach groups that enriched the life of the community at large, Holy Trinity fell well within the modern view, now sixty years old, that the good works of churches are not limited to parochial concerns. Thus, Holy Trinity was engaged in its good works at the time of Mrs. Ryan's accident.

### B.

■ In assessing who is a beneficiary of the works of a charity, that notion is to be interpreted broadly, as evidenced by the use of the words "to whatever degree" modifying the word "beneficiary" in the statute. Those who are not beneficiaries must be "unconcerned in and unrelated to" the benefactions of such an organization. *Gray v. St. ·Cecilia's School,* 217 *N.J.Super.* 492, 495, 526 *A.*2d 264 (App.Div.1987). Plainly, Mrs. Ryan was a beneficiary of the works of Holy Trinity at the time of the accident both as a member of the Mothers' Center, and as an attendee at a Mothers' Center function on Holy Trinity's premises.

That status was underscored in *Bixenman,* a case in which Christ Episcopal allowed the Greek Orthodox church to use its premises. *Bixenman, supra,* 166 *N.J.Super.* at 150, 399 *A.*2d 312. The plaintiff argued that she was not the beneficiary of Christ Episcopal's good works; rather, it was the Greek Orthodox church that obtained the benefit. *Id.* at 151, 399 *A.*2d 312. The Appellate Division properly rejected that contention, holding that because the Greek Orthodox church received benefits only as its members received benefits, the plaintiff, who was physically present on the premises of Christ Episcopal, benefited from Christ Episcopal's works. *Id.* at 152, 399 *A.*2d 312.

The same analysis applies in the present case. The Mothers' Center receives benefits through its members. Mrs. Ryan was a member of the Mothers' Center and was physically present on the premises of Holy Trinity for the purpose of receiving the benefits

conferred by that church on the Mothers' Center and the partakers of its programs.

The Ryans' reliance on *Mayer v. Fairlawn Jewish Center*, 71 *N.J.Super.* 313, 177 *A.*2d 40 (App.Div.1961), *aff'd, in part, rev'd on other grounds*, 38 *N.J.* 549, 186 *A.*2d 274 (1962), is misplaced. In that case, the director of a corporation selling Israeli bonds at the defendant Jewish Center was injured. *Id.* at 315–16, 177 *A.*2d 40. The Appellate Division concluded that the plaintiff was not a beneficiary of the Center's works because he was not a member of the Center and had no concern or relation to its benefactions. His presence at the Center was in the course of his employment, and not as a recipient of the Center's philanthropy or beneficence. *Id.* at 321, 177 *A.*2d 40. In affirming the Appellate Division in *Mayer*, we emphasized that even if Meyer's employer was a recipient of the Center's benefactions, his status on the premises could not be measured by that standard. His rights depended on his individual relation with the Center. He was present on the premises of the Jewish Center at the direction of his employer and in fulfillment of his function as an employee, not for the purpose of receiving personally the philanthropy of the Center. *Mayer, supra*, 38 *N.J.* at 553–54, 186 *A.*2d 274. *Mayer* is obviously irrelevant here because Mrs. Ryan was not an employee of the Mothers' Center, but a member attending a function.

█ In sum, the Appellate Division correctly concluded that Holy Trinity is entitled to charitable immunity because it is a nonprofit entity, it is organized exclusively for religious purposes, and at the time of the accident, it was promoting its objectives in respect of Mrs. Ryan, who was a beneficiary thereof.

## VI

The judgment of the Appellate Division is affirmed in part and reversed in part. To the extent that it approved the grant of summary judgment to Holy Trinity and Laura Fadem, individually, and held that the Mothers' Center was organized exclusively for educational purposes, it is affirmed. To the extent that it

remanded the case for a showing that the operating capital of the Mothers' Center is derived from charitable contributions or trust income, it is reversed. Summary judgment in favor of the Mothers' Center and Laura Fadem, as its agent, is reinstated.

*For affirming in part/reversing in part*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI, and ALBIN—7.

*Opposed*—None.