798 A.2d 131 (2002)
351 N.J. Super. 280
Mohammed ABDALLAH, Individually and on behalf of Amerah Abdallah, his mentally incompetent daughter, Plaintiffs-Appellants,
v.
OCCUPATIONAL CENTER OF HUDSON COUNTY, INC., Maureen Walliser, Christine Remler and Peter Salovitch, Defendants-Respondents,
New Jersey Department of Labor, Division of Vocational Rehabilitation Services; Hudson County Prosecutor's Office; New Jersey Department of Human Services, Division of Developmental Disabilities; Charles Montecchi; Maria T. Burgos Dejames; Donald Gardner; Kenneth Kolich; Sharon Mia and Julie Knoepflmacher, Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted March 12, 2002.
Decided May 30, 2002.
*132 Aslan T. Soobzokov, Paramus, attorney for appellants (Mr. Soobzokov and Johanna D. Roccanova, on the brief).
Boffa, Shaljian, Cammarata & O'Connor, Jersey City, attorneys for respondents Occupational Center of Hudson County, Inc., Maureen Walliser, Christine Remler and Peter Salovitch (Jeffrey G. Garrigan, Jersey City, on the brief).
Before Judges PRESSLER, PARRILLO and COLEMAN.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Mohammed Abdallah, individually and as guardian for his mentally incompetent daughter Amerah Abdallah, brought this action against defendants the Occupational Center of Hudson County, Inc. (OCHC), and various of its officers and employees seeking damages for their alleged negligence in supervising Amerah, an OCHC client, as a result of which, plaintiff claims, she was sexually abused in 1995 by another client, defendant Charles Montecchi. The action was dismissed on defendants' motion for summary judgment, the court concluding that defendants were entitled to the charitable immunity afforded by N.J.S.A. 2A:53A-7.[1] We reverse and remand. *133 We are satisfied that the record was inadequate to permit a determination of OCHC's entitlement to charitable status within the intendment of the statute and that the court's findings failed to address critical components of the charitable-status determination. That determination must be made based on an adequate and proper record.
N.J.S.A. 2A:53A-7, which restored charitable immunity following the Supreme Court's abrogation of that doctrine in Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29, 141 A.2d 276 (1958), and its companion cases,[2] accords immunity to a non-profit corporation or association "organized exclusively for religious, charitable or educational purposes" from liability for damages sustained by any of its beneficiaries resulting from its negligent acts. There is no question that Amerah Abdallah was a beneficiary of the activities of OCHC at the time of the conduct complained of, and there is no question that OCHC is organized on a non-profit basis. The only question which we deem unresolved is whether OCHC is organized exclusively for religious, charitable or educational purposes. The question must be addressed because we think it clear, as Justice Long, then Judge Long, explained in Parker v. St. Stephen's Urban Dev. Corp., 243 N.J.Super. 317, 324-325, 579 A.2d 360 (App.Div.1990), neither non-profit status nor the performance of socially useful services, either independently or together, are dispositive of charitable status.
Clearly, OCHC is not a religious organization. For the reasons we hereafter explain, it appears that it is also not an educational organization within the intendment of the statute. The issue is whether it is a charitable organization within the statutory intendment. We are aware that the Supreme Court in O'Connell v. Montclair, 171 N.J. 484, 795 A.2d 857 (2002), has elected to apply the statute literally in respect of non-profit educational organizations, affording immunity based solely on whether education is the organization's exclusive purpose, obviating the need for any further analysis of income sources and performance of governmental functions, and concluding, therefore, that the statute applies to public educational institutions. We have no doubt that the same literal reading of the statute would apply to religious organizations. But the terms "educational" and "religious" do have plain meanings that are subject to literal reading. We do not believe that charitable status as a generic category is so plainly and easily defined. Indeed, as the Supreme Court has observed, "the term `charity' in a legal sense is a matter of description rather than a precise definition." The Presbyterian Homes v. Division of Tax Appeals, 55 N.J. 275, 285, 261 A.2d 143 (1970). We therefore conclude that where a non-profit, non-religious, non-educational organization relies on the immunity *134 based on its asserted charitable status, a traditional analysis as exemplified by Parker, which looks beyond the organization's non-profit structure and social service activities, continues to be mandated. And, we are convinced, that traditional analysis must take into account the organization's source of funds as a critical element of charitable status.
We think it plain that where precise definitional terms are not used by a statute, the intended substantive content of its descriptive terms must be determined in the context of the purpose and policy of the statute. It is clear that the purpose of N.J.S.A. 2A:53A-7 was to restore the charitable immunity in its common-law form. That is to say, it was the purpose and policy underlying the common-law immunity that the Legislature intended to revive. See, e.g., Schultz v. Roman Catholic Archdiocese of Newark, 95 N.J. 530, 533, 472 A.2d 531 (1984). It is, furthermore, clear, as Parker explains, that "[t]he original point of the doctrine was to avoid diverting charitable trust funds to non-charitable purposes in order to live up to the reasonable expectations of the benefactor." Parker, supra, 243 N.J.Super. at 321, 579 A.2d 360. The doctrine may well have been the subject of judicial and academic criticism and consequent dispute as to its continued validity and viability. See, e.g., Collopy, supra, 27 N.J. at 42-43, 141 A.2d 276. See also Parker, supra, 243 N.J.Super. at 321-322, 579 A.2d 360. But there is agreement that its underlying purpose and rationale have always been the protection and encouragement of private philanthropy both to assure the continued provision of beneficent services and to relieve government of the burden of providing them. See Id. at 325-328, 579 A.2d 360. And see generally Restatement (Second) of Torts § 895E comment c (1979); 2 Harper & James on Torts, § 29.16 (1956).
Parker addressed the immunity as asserted by a non-profit, urban redevelopment corporation acting as a housing sponsor for low and moderate income housing and serving primarily as a conduit for federal funding. Its funds did not come from private donors. It did not solicit private contributions and engaged in no fund-raising activities. It consequently lacked "the essence of the public policy favoring charitable immunity ...," that is, "the preservation of private charitable contributions for their designated purposes." Parker, supra, 243 N.J.Super. at 326, 579 A.2d 360. Thus, as summed up by Justice Long in denying charitable-immunity status: "[n]o benefactor whose charitable contributions require protection exist in this case. Defendant is not a private charity which depends for its support on charitable contributions but is rather the quasi-public sponsor of a federally funded housing project." The Supreme Court in Bieker v. Comm. House of Moorestown, 169 N.J. 167, 178, 777 A.2d 37 (2001), has expressly approved the Parker rationale that "an organization claiming immunity under the Act must demonstrate some level of support from charitable donations and/or trust funds as it is those sources of income the Act seeks to protect."
It is in this context that we consider the status of OCHC as a charitable organization, at least insofar as we are able in light of this inadequate record. In this regard we note that while OCHC is apparently incorporated as a non-profit corporation, its certificate of incorporation was not included in the record. Although the record does include its audited financial reports for 1995 and 1996, only truncated portions of the deposition testimony of its employees have been given to us. There are also some inferences that can be *135 drawn from the various evaluation reports of Amerah and Montecchi that have been included in the record. Based on this sketchy record, our understanding of the operation of OCHC, which may be incomplete, is as follows:
The basic purpose of OCHC, as we understand it, is to provide vocational opportunities in the form of salaried jobs for the vocationally disabled, that is, persons who are unable to compete in the job market because of mental, psychiatric, or physical limitations. Those persons, called "consumers," are referred to it by the Division of Vocational Rehabilitation or the Division of Disability Determinations in the New Jersey State Department of Labor. Upon referral and after OCHC and the consumer are satisfied that the referral is appropriate, the consumer goes through a twenty-five day evaluation process based on medical and educational reports and a series of vocationally-oriented tasks designed to determine if the consumer can hold a job in the competitive labor market, and if so, what kind of job. OCHC places those consumers who are able to function in a specific job with private employers. Those who are not remain at OCHC for various lengths of time and for various purposes. All of them, however, as we understand it, are paid by OCHC for their work efforts following the evaluation period.
As we further understand, some consumers are placed on what is called extended employment. Extended employment appears to be synonymous with the concept of a sheltered workshop. That is, tasks are performed by consumers at the OCHC premises in what was termed its production area for private employers who pay OCHC to have them done. Other consumers receive what is termed "job coaching," in which OCHC facilities simulate a job in the private market for which the consumer is being prepared. Again, the work the consumer does at OCHC is subcontracted, as it were, and the consumer is paid by OCHC. According to the deposition testimony of both Montecchi and Amerah Abdallah, the consumers who work at OCHC after the evaluation period refer to their work there as their "jobs." Indeed, it was during the lunch break from their "jobs," when Amerah left the premises with Montecchi, as they were permitted to do, that his alleged sexual assaults upon her occurred.
It thus appears to us that OCHC functions as a combination of employment agency and sheltered workshop with a component of vocational counseling to determine employability and potential job performance. We do not regard this function as exclusively educational in any traditional, usual or common-language sense although, clearly, by virtue of the nature of its function, it potentially qualifies as a charitable endeavor.[3]
It further appears, however, that the sole significant source of OCHC funding is a combination of government grants from federal, state, county and municipal governments and payments made by the private market for the "subcontracted" labor and services of the consumers. We have carefully reviewed the consolidated audited financial statement of OCHC for the years 1995 and 1996. While we find it not entirely self-explanatory, it appears that OCHC's total revenue and support for those periods, including federal and state awards listed in accompanying schedules, amounted to approximately three and a half million dollars in 1996, of which *136 roughly half was provided by the state. In 1995, the total contributions were listed at about $48,000, or less than one and a half percent of the total; and in 1996, total contributions were less than $3,000, something less than one-tenth of a percent. While we do not know from this record any of the circumstances surrounding these contributions, we think it clear that their amount is too insignificant to have any effect on the charitable-status determination. Nor does this record suggest that OCHC solicits private contributions or is in any sense in the least dependent upon such contributions. Its very substantial operations are virtually exclusively funded by government money and compensation paid by the private market for value received. The facts here are very different from those addressed in Pelaez v. Rugby Labs., Inc., 264 N.J.Super. 450, 624 A.2d 1053 (Law Div.1993), in which Integrity House, a private non-profit drug rehabilitation facility, was accorded charitable immunity despite its receipt of substantial government grants precisely because it also relied heavily on private contributions which it actively solicited. Thus, it appears that in the circumstances before us, OCHC's situation, in terms of function and funding, is closely analogous to that of the non-profit quasi-governmental housing sponsor in Parker, and that the same result should obtain, namely the conclusion that it is not entitled to the charitable immunity accorded by the statute.
We are, however, reluctant to so hold at this time because of the inadequacy of the record. We are concerned that what is disclosed by the record and our inferences and assumptions therefrom may not constitute a sufficiently complete or fair picture of the entirety of the OCHC operation. We are, nevertheless convinced that OCHC was not entitled to summary judgment on this record. Charitable immunity is an affirmative defense, as to which, like all affirmative defenses, defendants bear the burden of persuasion. See, e.g., Pagano v. United Jersey Bank, 276 N.J.Super. 489, 500, 648 A.2d 269 (App. Div.1994), aff'd, 143 N.J. 220, 670 A.2d 509 (1996); Rendine v. Pantzer, 276 N.J.Super. 398, 435, 648 A.2d 223 (App.Div. 1994), aff'd, 141 N.J. 292, 661 A.2d 1202 (1995). Defendants have not done so on this motion.
The summary judgment dismissing the complaint on charitable-immunity grounds is reversed, and we remand for further proceedings.
NOTES
[1] At the time of the motion the only remaining defendants were Montecchi, OCHC, and three OCHC employees, defendants Walliser, Remler and Salovitch. Employees of a charitable organization are entitled to the same immunity as the organization. N.J.S.A. 2A:53A-7. The summary judgment motion was brought on behalf of all except Montecchi who, although served, did not respond or appear. The record does not indicate whether the action as against Montecchi was ever terminated. If it was not, then, because all claims against all parties would not have been disposed of, the summary judgment would be interlocutory. See, e.g., Gloucester City v. Am. Arbitration, 333 N.J.Super. 511, 519, 755 A.2d 1256 (App.Div.2000); Tradesoft v. Franklin Mut. Ins. Co., 329 N.J.Super. 137, 140-141, 746 A.2d 1078 (App.Div.2000). In the event that is so and leave to appeal would, therefore, have been required, we opt to grant leave to appeal nunc pro tunc.
[2] See Dalton v. St. Lukes Catholic Church, 27 N.J. 22, 141 A.2d 273 (1958); Benton v. Y.M.C.A., 27 N.J. 67, 141 A.2d 298 (1958).
[3] We do not, however, foreclose defendants from presenting a fuller picture of OCHC's function in an attempt to demonstrate that its function is exclusively educational within the intendment of the statute.