862 A.2d 60 (2004)
373 N.J. Super. 421
Alfred TONELLI, Administrator Ad Prosequendum of the Estate of Virginia T. Tonelli, Deceased, Plaintiff-Appellant,
v.
BOARD OF EDUCATION OF TOWNSHIP OF WYCKOFF and the Township of Wyckoff, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 27, 2004.
Decided December 7, 2004.
Donald A. Kessler, Florham Park, argued the cause for appellant (Schwartz, Simon, Edelstein, Celso & Kessler, attorneys; Mr. Kessler, on the brief).
Jeffrey L. Shanaberger, Princeton, argued the cause for respondents (Hill Wallack, attorneys; Mr. Shanaberger and Marilyn S. Silvia, on the brief).
Before Judges CUFF, WEISSBARD and KIMMELMAN.
The opinion of the court was delivered by
WEISSBARD, J.A.D.
In Hamel v. State, 321 N.J.Super. 67, 728 A.2d 264 (App.Div.1999), and again in Gerber v. Springfield Bd. of Educ., 328 N.J.Super. 24, 744 A.2d 670 (App.Div.2000), we held that local Boards of Education are not entitled to the protection of the Charitable Immunity Act (CIA), N.J.S.A. 2A:53A-7. In this case, believing that subsequent Supreme Court decisions had effectively overruled Hamel and Gerber, the Law Division applied the charitable immunity doctrine to defendant, Board of Education of Wyckoff (the Board) and dismissed the personal injury suit filed by plaintiff, Alfred Tonelli as Administrator ad Prosequendum of Virginia T. Tonelli (Virginia), deceased. We reach an opposite conclusion and therefore reverse.
The underlying facts are quite simple. On March 24, 2002, Virginia, a seventy-nine-year-old woman, went to the soccer field at the Wyckoff Lincoln School to watch her granddaughter participate in a game. After the game, while walking on a driveway aisle in the parking lot of the *61 school, Virginia tripped on a speed bump and fell, fracturing her hip. Plaintiff asserts that the speed bump was not noticeable, not marked with colored paint, and lacked any cautionary signs. Plaintiff and defendant disagree as to whether Virginia's death, six weeks later on May 4, 2002, was a result of her fall.
Virginia's granddaughter was a member of the Torpedoes Soccer Club, Inc. (the Club), a nonprofit corporation, which derives its income from player dues, team dues, and outside funding from team sponsors. According to its By-Laws, the Club was organized:
To promote participation in the sport of soccer through the organization, operation and maintenance of a competitive soccer program based in the Township of Wyckoff.
To promote and instill good sportsmanship and fellowship among all players, coaches and parents through the principles of honesty, discipline and fair play.
To educate the players, parents and general public with respect to the game of soccer and the value of the sport to them.
The Board had adopted a policy governing "Community Use of [Wyckoff] School Facilities." The policy establishes service, operational and facilities' charges to be imposed for use of its facilities. The policy expressly prohibits use of its facilities for gain, financial or otherwise, by private individuals or groups. In accordance with its written policy, the Board granted the Club use of the Lincoln School's soccer field and assessed fees for such use.
On September 26, 2002, plaintiff filed suit against the Board and the Township of Wyckoff arising out of Virginia's fall. The Board's Answer asserted as a separate defense that it was immune from liability on the basis of the CIA.
On March 4, 2003, plaintiff moved for partial summary judgment, on the ground that the Board is not entitled to charitable immunity. The Board cross-moved for summary judgment, on the ground that it is entitled to charitable immunity pursuant to the CIA. The claims against the Township of Wyckoff, originally a named defendant, were dismissed by stipulation.
After hearing oral argument, the Law Division judge issued a thoughtful letter opinion dated August 1, 2003, which denied plaintiff's motion and granted the Board's cross-motion. After a thorough review and analysis of relevant case law both before and after Hamel and Gerber, the judge concluded that Ryan v. Holy Trinity Evangelical Lutheran Church, 175 N.J. 333, 815 A.2d 419 2003) and O'Connell v. State, 171 N.J. 484, 795 A.2d 857 (2002), effectively overruled those Appellate Division cases.
On appeal, plaintiff once again asserts that defendant is not entitled to immunity under the CIA and also argues that even if the CIA were applicable, Virginia was not a beneficiary of the Board's charitable activities. Since we conclude that the Board is not entitled to CIA immunity, we have no need to address plaintiff's alternative argument.
The history of charitable immunity was set out concisely by Justice (then Judge) Long in Parker v. St. Stephen's Urban Dev. Corp., Inc., 243 N.J.Super. 317, 321-24, 579 A.2d 360, 362-64 (App.Div.1990), and need not be repeated here. It suffices to say that after the common law doctrine of charitable immunity was abrogated by Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29, 141 A.2d 276 (1958), the Legislature promptly enacted the CIA in 1959. As it read at the time of plaintiff's accident, the statute provides, in pertinent part:

*62 No nonprofit corporation, society or association organized exclusively for religious, charitable or education purposes or its trustees, directors, officers, employees, agents, servants or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association.
[N.J.S.A. 2A:53A-7a.]
In order to place the relevant recent decisions in their proper historical context, we must begin our analysis with Winters v. City of Jersey City, 63 N.J. 7, 8, 304 A.2d 196 (1973), in which the Court modified the judgment of the Appellate Division based upon Judge Lynch's dissent, Winters v. City of Jersey City, 120 N.J.Super. 129, 135-54, 293 A.2d 431, 434-45 (App.Div.1972) (Lynch, J.A.D., dissenting). In Winters, a husband and wife filed suit against the City for injuries sustained by the husband while he was a patient in a City hospital. The Appellate Division majority held that the statute limiting the liability of non-profit hospital, N.J.S.A. 2A:53A-8, applied to all non-profit hospitals, both privately and municipally owned and operated. Winters, supra, 120 N.J.Super. at 133-34, 293 A.2d 431. In his dissent, Judge Lynch explained why a hospital formed for nonprofit purposes and controlled solely by a municipality was not exempt from liability under the charitable immunity statute. Id. at 135-54, 293 A.2d at 433-34. He first pointed out that a city hospital cannot be sued because the statutory scheme is such that when a municipality operates a hospital, as Jersey City did there, the municipality shall "be sued in all courts and elsewhere, in all manner of actions, suits, complaints and demands whatsoever growing out of creation and maintenance of such hospital...." Id. at 136, 293 A.2d at 435 (quoting N.J.S.A. 30:9-16). In arriving at his conclusion, Judge Lynch stated that "public hospitals, like public schools, are not charitable or eleemosynary institutions." Id. at 138, 293 A.2d at 436 (citing White v. Charity Hosp. of La. in New Orleans, 239 So.2d 385 (La.Ct.App.1970)) (emphasis added).
Significantly, Judge Lynch explained that "[i]f Section 8 is to be interpreted as applying to defendant municipality, then N.J.S.A. 2A:53A-7 must be construed as affording total immunity to a Board of Education because it is organized `exclusively for ... educational purposes.' Such is not the law, and indeed, so far as I know, the contention has never been made." Id. at 140, 293 A.2d at 437. Finally, Judge Lynch concluded that because municipalities are not organized exclusively for hospital purposes, "[t]he statute cannot be construed as applying to a municipality operating a city hospital." Ibid.
Winters was referenced in two subsequent decisions, both authored by Judge Long. Graber v. Richard Stockton College of New Jersey, 313 N.J.Super. 476, 713 A.2d 503 (App.Div.), certif. denied, 156 N.J. 409, 719 A.2d 641 (1998) and Parker, supra, 243 N.J.Super. at 326-27, 579 A.2d at 365-66. In Parker, relying in part on Judge Lynch's opinion in Winters, the court held that defendant, a "quasi-public sponsor of a federally funded housing project" did not qualify for charitable immunity. *63 Id. at 327, 579 A.2d at 366. In Graber, on the other hand, the court concluded that Richard Stockton College was entitled to immunity from suit by a student who sustained injuries upon fainting after viewing an experiment in a laboratory. Plaintiff had sought to rely on Winters since Stockton was not a charitable business. Graber, supra, 313 N.J.Super. at 485, 713 A.2d at 507. However, Judge Long rejected that argument, noting that the CIA applied not only to charities but to nonprofit educational entities, as well. Ibid. Finding that Stockton met the requirements for charitable immunity, the court affirmed the summary judgment in favor of Stockton. Of course, neither Graber nor Parker involved a board of education, as was the case in Hamel and Gerber.
In Hamel, the plaintiffs filed suit against the Bergenfield Board of Education. The court held that the CIA is not intended to provide immunity to public entities, such as local school boards. The opinion explained that in 1958, when the Legislature was considering the law that became N.J.S.A. 2A:53A-7, the following colloquy occurred between Mr. Machman, a representative of the National Bureau of Casualty Underwriters, and the Chairman and members of the Assembly Judiciary Committee:
MR. MACHMAN: To what extent does the decision and [Senate Bill] 204 affect the schools? To the same extent that it affects other charitable institutions?
THE CHAIRMAN: The effect of [Senate Bill] 204, with reference to schools, was to place the law in the same position as it existed prior to the Supreme Court decisions. The Assembly Substitute keeps that situation intact, namely, as it existed prior to the Supreme Court decisions.
MR. MACHMAN: How does the Collopy case affect the situation?
THE CHAIRMAN: Well, the Collopy case would have rendered schools, the organization of the schools, liable.
ASSEMBLYMAN CONNERY: Destroys any immunity that the schools previously enjoyed with respect to accidents and injuries to persons occurring through the negligence of the agents  employees of the schools, etc.
MR. MACHMAN: Are we talking now about schools 
THE CHAIRMAN: We are not talking about public schools. We are talking about schools that are operated by religious and charitable organizations.
[Public Hearing Before Assembly Judiciary Comm. on Assembly Substitute for Senate Bill S-204 at 107-108 (July 17, 1958).]
We explained, "[i]n our view, the colloquy is a clear pronouncement that the Legislature never intended that the Act would afford immunity to public schools." Hamel, supra, 321 N.J.Super. at 74, 728 A.2d at 268.
Hamel cited Judge Lynch's dissent in Winters, to the effect that the purpose of charitable immunity was "mainly to protect the trust funds of such charities from serious dissipation... and to avoid diversion of their benefactors' contributions from the purpose for which they were made." Id. at 75, 728 A.2d at 268 (citing Winters, supra, 120 N.J.Super. at 144-45, 293 A.2d at 440). We further explained that public school boards, like municipalities, are not private charities which depend on charitable contributions and whose funds are held solely in trust for the charity. Ibid. Moreover, we observed that "a local school board is dependent essentially upon the tax dollar and federal subsidies." Id. at 76, 728 A.2d at 269 (citing Robinson v. Cahill, 62 N.J. 473, 516-19, 303 A.2d 273, 295-97 (1973)). Finally, we stated that, "where ... an entity is expressly *64 conceived, created and operated to serve purely as a conduit for [government] funds ... its denomination as a charity for immunity purposes is incorrect, notwithstanding its benevolent aims." Id. at 76, 728 A.2d at 269 (citing Parker, supra, 243 N.J.Super. at 327-28, 579 A.2d at 365-66).
The Hamel court distinguished Graber, noting that because a local board of education is an entity expressly created to serve as a conduit for government funds, it cannot be denominated a charity for immunity purposes. Id. at 77, 728 A.2d at 269. As it explained, "Stockton's [the defendant in Graber] operating budget is derived from various sources which include State support, tuition, contract fees, and gifts or donations." Ibid."Implicit in Graber is the court's reasoning that Stockton's fundamental nature as a nonprofit educational entity was not altered merely because it receives some governmental support." Ibid. Finally, we distinguished Graber based on the fact that Stockton is not mandated by the State Constitution to provide free educational services, rather it is "an institution of higher learning, chartered and licensed by the State, charging tuition to all students for the rendering of its educational services." Ibid.
In Gerber, supra, 328 N.J.Super. 24, 744 A.2d 670, a student who sustained injuries as a result of an attack by a classmate filed suit pursuant to the Tort Claims Act against the Springfield Board of Education, individual Board members and school employees. We concluded that the CIA did not afford a basis to grant summary judgment to the individual Board members. Id. at 39-41, 744 A.2d at 678-79. Essential to our decision was our agreement with Hamel. We stated, "[a] local school board of education is not entitled to immunity under the CIA." Id. at 40, 744 A.2d at 678 (citing Hamel, supra, 321 N.J.Super. at 77, 728 A.2d at 269). Thus, we concluded in Gerber, that immunity for individual Board members covered by the CIA does not apply to individual members of a local board of education. Gerber, supra, 328 N.J.Super. at 40, 744 A.2d at 678-79.[1]
We now turn to the several Supreme Court rulings that the motion judge concluded had left Hamel"but a shell, a holding without any viable reasoning [which has effectively] been overruled."
In O'Connell v. State, 171 N.J. 484, 795 A.2d 857 (2002), a student at Montclair State University brought a slip-and-fall action against the nonprofit university. The Appellate Division held that Montclair State was not entitled to charitable immunity. O'Connell v. State, 335 N.J.Super. 427, 762 A.2d 696 (App.Div.2000). The Court reversed, holding that "because an entity's receipt of public funds should not alter its status as a nonprofit entity under the CIA, we conclude that Montclair is entitled to charitable immunity." O'Connell, supra, 171 N.J. at 497, 795 A.2d at 864. In reaching that conclusion, the Court reasoned that "because the plain meaning of the statute supports the conclusion that Montclair is entitled to charitable immunity, the inquiry should end here." Id. at 491, 795 A.2d at 861. The Court first noted that Montclair's status as a nonprofit corporation, created exclusively for educational purposes, was not in dispute. Id. at 491, 795 A.2d at 861. Next, *65 the Court explained that the CIA is not limited to private entities, but also extends to public entities. Ibid. The Court expressly adopted the Graber court's determination that "application of the statute turns on satisfaction of each of the elements plainly set forth within it." Id. at 491-92, 795 A.2d at 861 (citing Graber, supra, 313 N.J.Super. at 481, 713 A.2d at 505). The Court then reviewed the same colloquy in the Assembly Judiciary Committee hearing that the Hamel court considered, concluding that,
[a]lthough the statement arguably evidences an `intent to exclude' public entities from the protection of the CIA, it also illustrates that, prior to enactment, the Legislature was well aware of the statute's broad language and that it could be interpreted to encompass any and all `nonprofit corporations.'
[O'Connell v. State, supra, 171 N.J. at 493, 795 A.2d at 862.]
The Court continued its analysis by distinguishing Winters. Ibid. The Court explained that "[i]n Winters, unlike the instant case, the statute organizing the city-owned hospital required that" all claims against the hospital be brought against the municipality. Id. at 493-94, 795 A.2d at 862 (citing Winters, supra, 120 N.J.Super. at 136, 293 A.2d at 435). In Winters,"the municipality fully funded the hospital and completely controlled all operations." Id. at 494, 795 A.2d at 862-63. "[U]nlike the city hospital in Winters, Montclair does not `render services to which qualified citizens are entitled as a matter of legal right.'" Id. at 495, 795 A.2d at 863 (citing Winters, supra, 120 N.J.Super. at 138, 293 A.2d at 436).
The O'Connell Court next addressed the issue of government funding. The Court further distinguished Winters in this context by explaining that in the present case, "Montclair is not a state-run institution, and, most important, is only partially funded by the State." Id. at 494, 795 A.2d at 863. Further, the Court explained that "Montclair's sources of funding are derived from tuition and charitable bequests in addition to State funding." Ibid. The Court concluded that "[t]he acceptance of government funds and some measure of government control does not transform a private nonprofit corporation into a governmental instrumentality." Id. at 495, 795 A.2d at 863 (citing Parker, supra, 243 N.J.Super. at 327-28, 579 A.2d at 365-66).
Shifting the focus to the legislative intent, the Court stated that preservation of a charity's assets was only one of a number of purposes propelling the CIA's enactment. O'Connell, supra, 171 N.J. at 496, 795 A.2d at 864. The Court pointed to the statute's "beneficiary/stranger" distinction, explaining that this distinction is rooted in the implied waiver or assumption of risk theory. Ibid. The Court reasoned that if the Legislature was "primarily motivated by the concern for protection of the charitable fund, it makes little sense that it would then include the `beneficiary/stranger' distinction [because] [t]he imposition of tort liability has the potential to deplete a charitable fund regardless of whether the judgment is paid to a beneficiary or a stranger." Id. at 497, 795 A.2d at 864.
Finally, the Court examined public policy considerations, stating that "as a matter of public policy, State and private colleges should be treated in a like manner for purposes of entitlement to the charitable immunity defense." Id. at 499, 795 A.2d at 866. The Court noted that "the Higher Education Restructuring Act of 1994, N.J.S.A. 18A:3B-1 to -36, was intended to place the operations of State colleges on par with private colleges." Ibid. The Court also relied on the fact that both state and private colleges receive public funding, a portion of which may be used, at *66 the institution's discretion, to satisfy tort judgments. Ibid. The Court reasoned that it would be paradoxical and inconsistent to hold that the public policy for the protection of nonprofit corporations organized for educational purposes did not apply to public universities. Ibid.
In concluding that the CIA protects nonprofit institutions that provide educational services, the Court emphasized that "[s]tate colleges plainly meet the statutory definition of a charitable institution under the CIA  a `nonprofit corporation... organized exclusively for ... educational purposes.' "Ibid. To the extent that the CIA applies to privately operated nonprofit corporations organized exclusively for educational purposes, it also should be applied to publicly operated corporations organized exclusively for educational purposes. Id. at 499-500, 795 A.2d at 866. Justice Stein dissented, agreeing with "Judge Havey's comprehensive and well-reasoned opinion...." Id. at 500, 795 A.2d at 866.
Defendant argues that O'Connell can only be read to have overruled Hamel by effectively overruling Winters, its conceptual underpinning. Indeed, in Abdallah v. Occupational Ctr. of Hudson County, Inc., 351 N.J.Super. 280, 798 A.2d 131 (App.Div.2002), the guardian of a client filed suit against an occupational center for negligent supervision resulting in a sexual assault. Although concluding that the record was inadequate to support a finding that the center was entitled to charitable immunity, id. at 288, 798 A.2d at 136, and while the only issue on appeal involved the second prong of the CIA analysis, the court made the following observation in the course of its discussion:
[w]e are aware that the Supreme Court in O'Connell v. Montclair, 171 N.J. 484, 795 A.2d 857 (2002), has elected to apply the statute literally in respect of nonprofit educational organizations, affording immunity based solely on whether education is the organization's exclusive purpose, obviating the need for any further analysis of income sources and performance of government functions, and concluding therefore, that the statute applies to public educational institutions.
[Abdallah, supra, 351 N.J.Super. at 284, 798 A.2d at 133.]
Clearly, this was dictum. Even so, we do not agree with defendants, or the motion judge, that O'Connell compels a grant of immunity here. As noted, O'Connell took great pains to distinguish Winters, not overrule it. Further, in critical respects, the present case may itself be distinguished from O'Connell. Here, unlike O'Connell, the entity at issue-a local board of education  is not "partially funded by the State," O'Connell, supra, 171 N.J. at 494, 795 A.2d at 863, but fully funded by public monies. Further, unlike Montclair State, a board of education renders "services to which qualified citizens are entitled as a matter of legal right." Id. at 495, 795 A.2d at 863. (quoting Winters, supra, 120 N.J.Super. at 138, 293 A.2d at 436). Given these pointed distinctions, we cannot conclude that O'Connell resolves the present case.[2]
We next turn to Ryan v. Holy Trinity Evangelical Lutheran Church, 175 N.J. 333, 815 A.2d 419 (2003), where a mother brought a negligence action against a nonprofit *67 group of parents and expectant mothers, called the Mother's Center, and the church that allowed the group to use its premises for meetings. The Court held that educational institutions are not required to demonstrate a level of income from charitable donations to qualify for charitable immunity. Ibid.
The Court began by noting that the cornerstone of its analysis was O'Connell. Ryan, supra, 175 N.J. at 343, 815 A.2d at 425. The Court reiterated that in O'Connell, "we held that an entity organized exclusively for educational purposes automatically meets the second prong of the charitable immunity standard." Ibid. The Court addressed the plaintiff's argument that there was a disconnect between O'Connell and Parker, explaining that O'Connell did not distinguish Parker because Parker was not relevant to the Court's analysis. Id. at 346, 815 A.2d at 426-27. Parker dealt only with charitable institutions, while O'Connell dealt with educational institutions. Ibid. The Court emphasized that the reason for the difference is that "the terms `educational' and `religious' have plain meanings that are subject to literal reading." Ibid. (citing Abdallah, supra, 351 N.J.Super. at 284, 798 A.2d at 133-34). In reaffirming O'Connell, the Court concluded "[e]ntities that can prove they are organized exclusively for educational or religious purposes automatically satisfy the second prong of the charitable immunity standard." Ryan, supra, 175 N.J. at 346, 815 A.2d at 427. Given the Court's reliance on O'Connell and the fact that the nature of the Mother's Center was that of an "educational" institution, quite unlike a board of education, we find no additional support for defendants' argument in Ryan. Either O'Connell mandates immunity for defendant Board of Education, or it does not. For the reasons given earlier, we believe it does not. Ryan adds nothing to the argument.
Finally, after Ryan, one Supreme Court decision and one Appellate Division decision require comment. In Frugis v. Bracigliano, 177 N.J. 250, 827 A.2d 1040 (2003), elementary school students filed an action against their former principal and the County Board of Education in connection with sexual abuse. The importance of the decision is the Court's tacit acknowledgment that a public board of education can be held liable for negligence. The Court acknowledged this proposition by endorsing the specific provisions of the Model Jury Charge, which provided, "[t]he ultimate issue to be decided is whether the Board failed `to use that degree of care, precaution and vigilance which a reasonably prudent [school board] would use under the same or similar circumstances.'" Id. at 270, 827 A.2d at 1051 (citing Model Jury Charge (Civil), 5.10, "Negligence and Ordinary Care-General," (pre-1984)). The Court also quoted the following language from the Model Civil Jury Charge 5.32: "[t]he theory behind the duty is that the relationship between the child and school authorities is not a voluntary one but is compelled by law." Id. at 270, 827 A.2d at 1051. Although it can be argued, as defendant does, that the specific issue was not before the Court because the Board of Education apparently did not raise charitable immunity as a defense, we find it difficult, if not impossible, to comprehend how the Court would proceed as it did if its earlier decisions, specifically O'Connell, had rendered the Board immune.
In Hardwicke v. Am. Boychoir School, 368 N.J.Super. 71, 845 A.2d 619 (App.Div.), leave to appeal granted, 180 N.J. 446, 852 A.2d 186 (2004), former students of a private boarding school, operated as a nonprofit corporation, filed a lawsuit against *68 the school, alleging causes of action pursuant to the Child Sexual Abuse Act (CSAA), as well as common-law causes of action predicated on sexual abuse. This court held, among other things, that the CIA did not bar direct common law claims of intentional conduct by or attributed to a private boarding school arising out of sexual abuse, insofar as those claims were independent from claims asserted under the CSAA. Ibid. Because the school in that case was private and because the holding is limited to intentional conduct as opposed to negligence, Hardwicke is largely inapplicable to the issue on this appeal. Ibid. However, in explaining how the case is different from Frugis, we stated, "because a public school board and its employee were the defendants [in Frugis], [that] case did not raise issues of charitable immunity." Id. at 76, 845 A.2d at 622.
Given (1) the clear holding in Hamel, (2) the O'Connell opinion's efforts to distinguish Winters, and (3) the result in Frugis, we simply find ourselves unable to agree with the studious opinion of the motion judge that defendant Board of Education is entitled to charitable immunity, absent an explicit holding to that effect by the Court.[3]
Reversed and remanded.
NOTES
[1] In addition to Graber, defendants also point to the decision in Bloom v. Seton Hall Univ., 307 N.J.Super. 487, 704 A.2d 1334 (App.Div.1998). Bloom held, without any discussion of the issue or any citation to other cases, that Seton Hall University was entitled to immunity as an educational institution. Id. at 490-91, 704 A.2d at 1335-36. Defendants argue that the Hamel court's efforts to distinguish Graber and Bloom; Hamel, supra, 321 N.J.Super. at 76-77, 728 A.2d at 269, "are not persuasive." We disagree.
[2] Plaintiff points to O'Connell's citation of Hamel, id. at 489, 795 A.2d at 860, as evidence that the Court did not intend to overrule Hamel, but, rather, still considered it good law. Given the general nature of the citation, we are inclined to agree with defendants that plaintiff reads too much into it. We draw no conclusion from the Court's mention of Hamel.
[3] In light of our disposition, we need not address plaintiff's alternate argument that the motion judge also erred in holding that Virginia was a beneficiary of the works of the Board at the time of her accident. In addition, as a public entity, the Board is subject to the Tort Claims Act, N.J.S.A. 59:4-1 to 9-7. On remand, defendants will be free to raise any appropriate Tort Claims Act issues.