NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1862-18T1

F.K.,

     Plaintiff-Appellant,

v.

INTEGRITY HOUSE, INC.,

     Defendant-Respondent,

and

THOMAS LUSCH and MARVIN
DEUPREE,

     Defendants.

_____

APPROVED FOR PUBLICATION

July 8, 2019

APPELLATE DIVISION

Submitted May 20, 2019 – Decided July 8, 2019

Before Judges Sumners, Mitterhoff and Susswein.

On appeal from the Superior Court of New Jersey,
Law Division, Essex County, Docket No. L-2239-16.

Marc L. Winograd, attorney for appellant.

Law Offices of Daniel J. Mc Carey, LLC, attorneys
for respondent (Daniel J. Mc Carey, on the brief).

The opinion of the court was delivered by

MITTERHOFF, J.S.C. (temporarily assigned).

Plaintiff F.K. appeals the trial court's December 11, 2018 order granting summary judgment to defendant Integrity House and dismissing his complaint with prejudice. The trial court determined that defendant was entitled to immunity from plaintiff's negligence action under New Jersey's Charitable Immunity Act ("the Act"), N.J.S.A. 2A:53A-7 to -11. On appeal, plaintiff contends that the amount of private contributions received by defendant, roughly $250,000 or 1.26% of annual revenue, is too insignificant to entitle defendant to charitable immunity. Having reviewed the record in light of the applicable legal principles, we conclude that defendant did not present sufficient evidence to support its entitlement to the affirmative defense of charitable immunity. Accordingly, we reverse.

I.

We glean the following facts from the record.

Integrity House's stated purpose in its certificate of incorporation is "[t]o keep former drug addicts drug free." Integrity House is a tax-exempt organization under section 501 (c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). On its 2015 tax return, Integrity House described its mission as follows: "Integrity House is committed to helping individuals and families through an effective and measurable system of comprehensive therapeutic

community addiction treatment and recovery support in a way that brings about positive, long-term lifestyle change."

As alleged in his complaint, plaintiff was a resident at the Integrity House residential drug-treatment facility in Newark. On November 3, 2015, he sustained personal injuries when he slipped and fell due to a wet condition on an interior staircase within the facility. Plaintiff filed a complaint alleging Integrity House was negligent in the maintenance of the premises.

Integrity House answered the complaint, asserting, among other defenses, the affirmative defense of charitable immunity. Before the close of discovery, Integrity House moved for summary judgment on the ground of charitable immunity. In support of its motion for summary judgment, Integrity House submitted its 2015 tax return.[1]

Integrity House reported $20,094,046 in total revenue for the 2015 tax year. According to Part VII, "Statement of Revenue," Integrity House received $15,355,805 from government grants,[2] $157,310 from fundraising events, and $296,409 from "[a]ll other contributions, gifts, grants, and similar amounts not

---

[1] Specifically, Integrity House filed a Form 990 "Return of Organization Exempt from Income Tax."

[2] Integrity House received $12,036,891 from the New Jersey Department of Human Services, $1,114,993 from Hudson County, and $1,502,370 from the New Jersey Department of Children and Families.

included above." Integrity House also reported $4,261,364 in "program service revenue."[3] With regard to the fundraising revenue and private contributions, Schedule G, Part II, "Fundraising Events," specifies that Integrity House received $252,855 in "gross receipts" from two fundraising events[4] and $157,310 in "contributions" from those events.

After hearing oral argument on May 12, 2017, the trial court issued an order and written opinion denying the motion for summary judgment. The trial court concluded that while Integrity House's 2015 tax return appeared to show that it received roughly $250,000 in contributions, the record did not conclusively "reveal the source of those funds and how they were utilized." The trial court noted that there was still one month before the discovery end

---

[3] The tax return further delineates the "program services revenue" as follows: $1,553,390 from Work First NJ/SAI; $900,730 from welfare and food stamp revenue; $286,721 from federal probation program fees; $83,049 from the intensive supervision program; $1,307,168 from other program related revenue; and $130,306 from all other program service revenue. In support of its motion for summary judgment, Integrity House did not submit evidence detailing the fee structure for its programs, including whether any of its programs are offered at no or reduced cost or whether it bills medical insurance providers.

[4] These events are listed as "Gala" and "Golf." There is no evidence in the summary judgment record detailing Integrity House's specific fundraising efforts in the 2015 tax year.

date and determined that Integrity House's source of funds remained a disputed factual issue.

After the close of discovery, Integrity House re-filed its motion for summary judgment. The renewed motion added only short certifications of Integrity House's CEO and CFO stating that all of the roughly $252,000 in "gross receipts" raised from fundraising for the 2015 tax year were used in furtherance of Integrity House's charitable purposes.

In opposition to defendant's renewed motion for summary judgment, plaintiff submitted a report from a forensic accounting expert analyzing the 2015 tax return. In pertinent part, the expert concluded:

> I have looked at the financial documents and have highlighted certain pages and line items. Annexed hereto as Exhibit A is page one of Integrity House's 2015 Form 990. This page reports total revenues received of $20,094,046 for 2015 but the [d]efendant in its brief makes no mention of this amount.
>
> With regard to the "charitable contribution of almost $300,000 for the calendar year," attention is directed to Schedule G. Part II, Fundraising Events, annexed hereto as Appendix B. On that page, the sum of $252,855 is reported as gross receipts from fundraising events and the sum of $157,310 is reported as contributions. The [d]efendant in his brief provides absolutely no explanation as to the source of the funds for either of these amounts. As a forensic accountant, without supporting third-party documentation, I cannot determine whether these funds were obtained from a government or private source.

With regard to the certification of [Integrity House's CFO], I note that she provides absolutely no information regarding the source of Integrity House's revenue in the year 2015. She provides no explanation regarding the source of the $20,094,046 received by Integrity House during that year and she provides absolutely no analysis regarding the source of the $252,855 reported as gross receipts and no analysis of the $157,310 reported as contributions. It appears that all she attempts to do in her certification is justify Integrity House's expenditures. Her certification does not enable me, as a forensic accountant, to determine whether these funds were obtained from a government or private source. The certification of [Integrity House's CEO] provides absolutely no information in this regard as well.

Conclusion
In my professional opinion and to a reasonable degree of certainty in the field of forensic accounting, Integrity House has failed to provide an analysis of the source of its funds for the year in which the November 3, 2015 accident took place. Based on the information provided by Integrity House, there is absolutely no documentation which would facilitate a determination of the funding sources.

Without hearing further oral argument, the trial court entered an order granting summary judgment on October 27, 2017.

Plaintiff appealed, and we vacated the dismissal order and remanded for further proceedings because the trial court failed to issue an oral or written reasoning for its conclusion that Integrity House was entitled to charitable immunity. F.K. v. Integrity House, No. A-1376-17 (App. Div. October 26,

6

2018).  On remand, the trial court issued an order and written opinion granting summary judgment on December 11, 2018.[5]

In its written decision, the trial court determined that Integrity House established the three elements necessary for charitable immunity:  that the organization "(1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works."  Tonelli v. Bd. of Educ. of Wyckoff, 185 N.J. 438, 444-45 (2005) (quoting Hamel v. State, 321 N.J. Super. 67, 72 (App. Div. 1999)).

The trial court found that Integrity House satisfied the first prong based upon its incorporating documents and status as a non-profit organization as defined in Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).  In so holding, the trial court rejected plaintiff's reliance on Abdallah v. Occupational Ctr. of Hudson Cty., Inc., 351 N.J. Super. 280 (App. Div. 2002) and contention that Integrity House received too small a portion of its funding from private contributions.  The trial court reasoned:  "The [c]ourt's opinion in [Morales v. N.J. Acad. of Aquatic Scis., 302 N.J. Super. 50 (App.

---

[5]  The trial court did not allow for new submissions or hold oral argument on remand.

Div. 1997)] is clear that a receipt of government funds, even if that encompasses the majority of an entity's funding, does not eliminate an entity's protection under the Charitable Immunity Act."[6]

The trial court found that Integrity House met the second prong, reasoning:

> Defendant Integrity House has presented extensive evidence that it does not merely distribute government funds, but provides actual services to individuals, including housing and counseling. The [c]ourt finds that the [d]efendant Integrity House has satisfied the second prong of the analysis required under N.J.S.A. 2A:53A-7, having demonstrated that is organized for religious, charitable or education purposes, as evidenced by their statement of purpose, as well as the services they provide.

Finally, the trial court concluded that Integrity House satisfied the third prong because plaintiff was a resident at Integrity House's drug treatment facility at the time of the accident.

Accordingly, the trial court issued an order granting summary judgment and dismissing plaintiff's complaint with prejudice.

## II.

On appeal, plaintiff challenges only the trial court's determination as to the second prong of the charitable immunity analysis. He argues that the

---

[6] As discussed below, this analysis actually falls under the second prong.

$252,855 in private contributions, comprising 1.26% of Integrity House's total revenue in the 2016 fiscal year, is too insignificant to establish that Integrity House is organized exclusively for charitable purposes and to entitle it to immunity under the Act.

Integrity House counters that "no statute or court in this State has provided precise guidelines regarding the exact percentage of revenue derived from charitable sources required to confer charitable status." It maintains that the $252,855 in gross receipts and the $157,310[7] in contributions, comprising 2.04% of its 2016 revenue, are "sufficient for Integrity House to establish that it is entitled to charitable immunity protection because, unlike the defendant in Abdallah, Integrity House actively pursued these funding sources and the funds directly supported its charitable endeavors."

## A.

We review a grant of summary judgment de novo, applying the same standard as the trial court. Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a

---

[7] It appears that Integrity House mistyped this sum as $157,855 in its brief.

 A-1862-18T1

matter of law." R. 4:46-2(c). The court considers whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

"The trial court's conclusions of law and application of the law to the facts warrant no deference from a reviewing court." W.J.A. v. D.A., 210 N.J. 229, 238 (2012) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). Accordingly, "[a] trial court's determination of the applicability of charitable immunity is reviewed de novo because an organization's right to immunity raises questions of law." Green v. Monmouth University, 237 N.J. 516, 529 (2019).

B.

The Supreme Court recently recounted the history of charitable immunity in New Jersey:

> New Jersey's doctrine of charitable immunity was first declared "as a judicial expression of [New Jersey's] public policy" in D'Amato v. Orange Memorial Hospital, 101 N.J.L. 61 (E. & A. 1925), but was expressly repudiated by this Court in Collopy v. Newark Eye & Ear Infirmary, 27 N.J. 29 (1958), as lacking historical foundation and contrary to "modern concepts of justice."

10

The Legislature immediately responded by passing a precursor to the Charitable Immunity Act and, a year later, the Act itself.  Through that legislation, "'the common law doctrine as it had been judicially defined by the courts of this State' was restored."

The Charitable Immunity Act's "original purpose was to avoid the diversion of charitable trust funds 'to non-charitable purposes in order to live up to the reasonable expectations of the benefactors.'"  "Over time, however, our case law has recognized that the purposes underlying charitable immunity are broader than simply preserving charitable trust funds and include the encouragement of altruistic activity" by limiting the economic impact of litigation on charities.

[Green, 237 N.J. at 529-30 (alteration in original) (citations omitted).]

The Act provides that

[n]o nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes or its trustees, directors, officers, employees, agents, servants or volunteers shall . . . be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association . . . .

[N.J.S.A.  2A:53A-7(a).]

The Legislature directed that the Act

shall be deemed to be remedial and shall be liberally construed so as to afford immunity to the said corporations, societies and associations from liability as provided herein in furtherance of the public policy

11

> for the protection of nonprofit corporations, societies and associations organized for religious, charitable, educational or hospital purposes.
>
> [N.J.S.A. 2A:53A-10.]

Nonetheless, "[o]nly those classes of entities that were immunized under common law remain within the sweep of the Act.  However, as to those entities, the several provisions of the Act should be liberally construed to afford immunity."  Tonelli, 185 N.J. at 444; see also Hardwicke v. Am. Boychoir Sch., 188 N.J. 69, 98 (2006) ("[A]lthough N.J.S.A. 2A:53A-10 states that [the Act] 'shall be liberally construed,' we must consider the scope of that common law when interpreting the scope of the immunities provided in the statute.").

### C.

"Charitable immunity is an affirmative defense, as to which, like all affirmative defenses, defendants bear the burden of persuasion."  Abdallah, 351 N.J. Super. at 288.  As stated above, an entity seeking charitable immunity must establish that it "(1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works."  Tonelli, 185 N.J. at 444-45 (quoting Hamel, 321 N.J. Super. at 72).

With regard to the second prong, "neither non-profit status nor the performance of socially useful services, either independently or together, are dispositive of charitable status." Abdallah, 351 N.J. Super. 283-84. "Whether a nonprofit entity, whose certificate of incorporation and by-laws provide that it is organized exclusively for charitable, religious, educational, or hospital purposes, actually conducts its affairs consistent with its stated purpose often requires a fact-sensitive inquiry." Kuchera v. Jersey Shore Family Health Ctr., 221 N.J. 239, 252 (2015). "What is required is an examination of the entity seeking to clothe itself in the veil of charitable immunity to discover its aims, its origins, and its method of operation in order to determine whether its dominant motive is charity or some other form of enterprise." Parker v. St. Stephen's Urban Dev. Corp., Inc., 243 N.J. Super. 317, 325 (App. Div. 1990).

Because "[b]oth 'educational' and 'religious' have a limited and commonly understood meaning . . . [but] 'charitable' is a more complex notion that defies precise definition[,]" the Court has prescribed distinct inquiries for organizations seeking immunity for educational or religious purposes and organizations seeking immunity for charitable purposes. Ryan v. Holy Trinity Evangelical Lutheran Church, 175 N.J. 333, 343 (2003). "Entities that can prove they are organized exclusively for educational or religious purposes automatically satisfy the second prong of the charitable immunity standard"

13                                                A-1862-18T1

and "no further financial analysis is required to satisfy the second prong of the Act."  Id. at 346.

In contrast, for an entity asserting that it is organized for charitable purposes, a reviewing court must conduct a "source of funds assessment" to discern whether a charitable purpose is being fulfilled.  Ibid.; Abdallah, 351 N.J. Super. at 284 (noting that the source of funds analysis "looks beyond the organization's non-profit structure and social service activities" and "must take into account the organization's source of funds as a critical element of charitable status.").  In this regard, "an organization claiming immunity under the Act must demonstrate some level of support from charitable donations and/or trust funds as it is those sources of income the Act seeks to protect." Bieker v. Cmty. House of Moorestown, 169 N.J. 167, 178 (2001) (emphasis added); see also Morales, 302 N.J. Super. at 56 (noting that the defendant "receive[d] a substantial amount of charitable contributions, which is one of the essential characteristics of a non-profit corporation entitled to charitable immunity." (footnote omitted)).

In the seminal case of Parker, Justice Long, then an Appellate Division judge, explained that an entity asserting a charitable purpose must show it "undertak[es] acts by which the government is relieved pro tanto from a burden it would otherwise have to perform."  243 N.J. Super. at 326.  In that

case, we reversed a grant of charitable immunity to a nonprofit corporation established by St. Stephen's A.M.E. Zion Church to serve "as a conduit for federal mortgage money and for federal rent subsidies" to fund a low and moderate income housing complex. Id. at 325. We reasoned that the entity "was not created to lessen the burden on government but to obtain as much funding from the government as possible and to operate the project exclusively with that funding. As such, it is no more entitled to charitable immunity than the government itself." Id. at 326. We also emphasized that "[e]qually important is the absence from defendant's operation of fund-raising activities and charitable contributions." Ibid.

Similarly, in Abdallah, we reversed a grant of charitable immunity to an occupational center that provided training and job placement for vocationally disabled individuals because it received the vast majority of its funding through governmental grants and payments from employers for subcontracted labor. 351 N.J. Super. at 287-88. We found that annual private contributions amounts of $48,000, or less than one-and-one-half percent of the total revenue, and $3,000, or less than one-tenth of one percent of total revenue, were "too insignificant to have any effect on the charitable-status determination." Id. at 288. We also were "concerned that what is disclosed by the record and our inferences and assumptions therefrom may not constitute a sufficiently

complete or fair picture of the entirety of the [defendant's] operation." Ibid. For these reasons, we found that the defendant had failed to carry its burden to establish charitable immunity. Ibid.

The Supreme Court also has denied charitable immunity to purported charitable organizations. See Kuchera, 221 N.J. at 254-55 (rejecting a contention that an outpatient facility owned by a nonprofit hospital was organized for charitable purposes based on its provision of charity care and holding that the organization was entitled only to limited liability for hospitals under N.J.S.A. 2A:53A-8); Tonelli, 185 N.J. at 450 (holding that a township school board was not entitled to charitable immunity because it was "not supported by charitable contributions, philanthropic activity or a spirit of altruism[,]" was funded solely by public funds, did not "relieve[] the government of the need to provide beneficent services[,]" and was "an instrumentality of the State itself[.]"); Bieker, 169 N.J. at 179-80 (remanding for consideration of whether a community center received too great a quantity of income from the rental of its facilities to for-profit entities so as to render the organization's primary purpose non-charitable).

Nonetheless, "the acceptance of government funds and some measure of government control does not transform a private non-profit corporation into a governmental instrumentality." Morales, 302 N.J. Super. at 55; see also

Estate of Komninos v. Bancroft Neurohealth, Inc., 417 N.J. Super. 309, 325 (App. Div. 2010) (noting that "the percentage figure [of private contributions] does not rigidly dictate the analysis of charitable status."). Accordingly, we affirmed the grant of charitable immunity to New Jersey Academy of Aquatic Sciences, which operated the New Jersey State Aquarium, even though "the State provide[d] support to the Academy by leasing the Aquarium and its facilities for a nominal rent . . . [and] exercise[d] control over certain aspects of its operations[.]" Morales, 302 N.J. Super. at 55. We noted that the organization "received $4,012,383 in contributions and grants, which constituted more than 40% of its total revenues." Id. at 56 n.1.

Notably, in 1993 the Law Division held that Integrity House was entitled to charitable immunity in a published opinion in Pelaez v. Rugby Labs., Inc., 264 N.J. Super. 450 (Law Div. 1993). In that case, the court discussed the following evidence of Integrity House's funding:

> Lorraine Brown, an employee of Integrity House familiar with its funding, was deposed. Ms. Brown testified that Integrity House raises private contributions through various fund-raising activities. Contributions are raised by submitting proposals to various private foundations, conducting car wash operations, soliciting advertisements for a graduation journal, and soliciting donations from churches in exchange for work performed at those churches by Integrity House patients.

17

Integrity House tax returns for 1988 revealed that out of a total funding of $3,027,009 defendant Integrity House received $2,550,870 (84.3%) from governmental grants, and $476,139 (15.7%) from public support of various organizations, foundations and individuals. Public support income consisted of $308,452 (10.2%) worth of in-kind contributions and $167,687 (5.5%) from monetary contributions.

In 1989, Integrity House tax returns revealed that out of a total funding of $4,112,706 Integrity House received $3,398,425 (82.6%) from governmental grants and $714,281 (17.4%) from public support. Public support in 1989 consisted of $377,671 (9.2%) worth of in-kind contributions and $336,610 (8.2%) from monetary contributions.

[Id. at 453-54.]

Relying on this evidence, the Law Division distinguished Integrity House's funding from that of the housing organization in Parker. Id. at 457-58. The court reasoned, "[d]espite plaintiff's argument that private contributions made up only a small portion of defendant's revenues, tax records indicate that Integrity House relies on private charitable contributions to operate this drug rehabilitation center, and accordingly lessens the government burden of providing such funding." Id. at 457. Whereas the organization in Parker did not engage in fundraising activities, the Law Division found that the record supported that Integrity House "made substantial efforts to obtain funding from private sources." Id. at 458.

18

D.

Having carefully reviewed the summary judgment record in light of the above legal principles, we conclude that Integrity House failed to sustain its burden to prove entitlement to charitable immunity. Accordingly, the trial court improvidently granted summary judgment.

Initially, we note that the parties dispute the percentage of total revenue that Integrity House receives from private charitable contributions. In his appellate brief, plaintiff relies on $252,855 designated as "gross receipts" as the figure for Integrity House's total private contributions for the 2015 year. In contrast, Integrity House relies on both the $252,855 designated as "gross receipts" and the $157,310 designated as "private contributions" for a total of $410,165 in total contributions. Using plaintiff's figure, the $252,855 in "gross receipts" represents 1.26% of Integrity House's total revenue. Using Integrity House's figure, the $410,165 in total private contributions represents 2.04% of Integrity House's total revenue.

Based on the summary judgment record, particularly the unrebutted forensic accounting expert report, we are unable to conclusively determine which figures should be used in the charitable immunity analysis. More broadly, as the trial court found in its initial order and decision denying

summary judgment, the record does not allow for a conclusive determination as to the source and use of Integrity House's funding.[8]

Because Integrity House did not submit sufficient evidence to substantiate the source and use of its funding, we find that Integrity House did not present sufficient evidence to support its burden of persuasion on the affirmative defense.  See Abdallah, 351 N.J. Super. at 288.  In addition to failing to provide evidence to assist in analyzing its tax return and determining the percentage of funds received from charitable contributions, Integrity House did not submit any evidence to:  (1) specify the fee structure for its services; (2) detail its fundraising efforts beyond the indication on its tax return that it held a golf event and a gala event; (3) rebut plaintiff's forensic accounting expert's report; or (4) substantiate that its public service efforts relieved the government of a burden.

The Law Division's decision in Pelaez is thus factually distinguishable from the instant matter.  Most notably, both the gross sums of private

_____

[8]  Integrity House failed to certify specifically as to the amount of private charitable contributions or present its own accounting expert.  As plaintiff's expert found, the CEO's and CFO's certifications added nothing regarding the source of funding to the record after the trial court initially denied summary judgment on the grounds that Integrity House had failed to provide a sufficient analysis as to the source of its funds.  Instead, the CEO's and CFO's certifications only state that the $252,855 in gross receipts from fundraising events was all spent in advancement of Integrity House's charitable proposes.

contributions and percentages of total revenue in 1988 ($476,139; 15.7%) and 1989 ($714,281; 17.4%) are substantially greater than the figures presented in this case. See Pelaez, 264 N.J. Super. at 454. Moreover, the employee's deposition provided specific evidence of the fundraising activities undertaken by Integrity House. See id. at 454-55. By contrast, in this case, Integrity House has not submitted certifications or any evidence other than its 2015 tax return detailing its fundraising efforts or supporting that it relies on private charitable contributions for any of its programs.

Unlike Pelaez, the current record does not establish that Integrity House "actively seeks private contributions and derives a substantial amount of income from private contributions." Id. at 457. Considering the fact-specific nature of the analysis of the second prong under the Act, see Kuchera, 221 N.J. at 252, Integrity House cannot rely on the Law Division's decision based on financial data from roughly twenty years ago.

In addition, although a determination of the specific percentage of funding Integrity House receives from private contributions is not necessary for our analysis, we note for completeness that no published case has granted charitable immunity to a non-religious, non-educational entity with such a small portion of funding from private contributions. The closest precedent with respect to the small percentage of private contributions is Komninos, but

21

that case is distinguishable because we determined that the defendant group home fulfilled an educational purpose, obviating the need to conduct a source of funds analysis. See Komninos, 417 N.J. Super. at 325 ("Moreover, for the reasons we have already expressed, [the organization's] immunized status is established by its core educational purposes.").

Using either plaintiff's or defendant's figures, the percentage of private contributions received by Integrity House seems too nominal to advance the underlying purpose of the doctrine to protect and encourage private charitable contributions. See Abdallah, 351 N.J. Super. at 285 ("[T]here is agreement that [the doctrine's] underlying purpose and rationale have always been the protection and encouragement of private philanthropy both to assure the continued provision of beneficent services and to relieve government of the burden of providing them."). Viewing the summary judgment record in the light most favorable to plaintiff, the substantial sum of government funding received by Integrity House, $15,355,805 or over three-fourths of its 2015 fiscal year total revenue, allows for the reasonable inference that it is attempting to maximize the amount of governmental funding it can receive in a fashion similar to the goals of the housing organization in Parker.

Ultimately, Integrity House bears the burden of persuasion on its affirmative defense of charitable immunity, Abdallah, 351 N.J. Super. at 288,

22

and we must view the evidence in the light most favorable to plaintiff.  <u>Brill</u>, 142 N.J. at 540.  Judged against these standards, we conclude that the trial court erred in determining that Integrity House was entitled to charitable immunity.

Reversed and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

23

A-1862-18T1